## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
                                    :
**In re**                           :        **Chapter 11**
                                    :
**NEXITY FINANCIAL CORPORATION,**[1] :      **Case No. 10-_____ (___)**
                                    :
          **Debtor.**               :
                                    :
------------------------------------------------------------x

## DECLARATION OF GREG L. LEE IN SUPPORT OF DEBTOR'S
## CHAPTER 11 PETITION AND REQUEST FOR FIRST DAY RELIEF

I, Greg L. Lee, being fully sworn, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chairman of the Board and Chief Executive Officer of Nexity Financial Corporation ("NFC" or the "Debtor"), the debtor and debtor in possession in the above-referenced chapter 11 case (the "Chapter 11 Case"), and its wholly-owned subsidiary Nexity Bank.[2] I have been employed in such capacity by the Debtor and Nexity Bank since 1999 and am familiar with the day-to-day operations, business and financial affairs of the Company.

2.      I submit this declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of the Chapter 11 Case and in support of (i) the Debtor's voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), filed on the date hereof (the "Petition Date") and (ii) the relief, in the form of motions and applications, that the Debtor has requested of the Court (the "First Day Pleadings").

---

[1] The last four (4) digits of the Debtor's federal identification number are 2937. The Debtor's principal place of business is located at 3680 Grandview Parkway, Suite 200, Birmingham, Alabama 35243.

[2] The Debtor and its non-Debtor affiliates, including Nexity Bank, are collectively referred to herein as the "Company."

3.     Prior to the Petition Date, the Debtor solicited votes on the *Prepackaged Plan of Reorganization of Nexity Financial Corporation Under Chapter 11 of the Bankruptcy Code* (as amended on July 15, 2010, the "Prepackaged Plan")[3], through its *Disclosure Statement Relating to the Prepackaged Plan of Reorganization of Nexity Financial Corporation Under Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement") pursuant to sections 1125 and 1126(b) of the Bankruptcy Code, both filed contemporaneously herewith. Capitalized terms not otherwise defined herein have the meanings given to them in the Prepackaged Plan. The Prepackaged Plan has been accepted by all classes entitled to vote in excess of the statutory thresholds specified in section 1126(c) of the Bankruptcy Code.

4.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussion with other members of the Company's senior management, my review of relevant documents, or my opinion based upon my experience and knowledge of the Company's operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

5.     This Declaration is intended to provide a summary overview of the Company's business and the Chapter 11 Case. Sections I through V of this Declaration provide a description of the Company's businesses, corporate history and organizational structure, capital structure, and the circumstances giving rise to the commencement of the Chapter 11 Case. Section VI summarizes the First Day Pleadings and the relief they seek, which the Debtor believes is crucial to its successful reorganization.

---

[3] The Prepackaged Plan was amended on July 15, 2010, to address certain issues raised by Bank of America, N.A. (the "Secured Lender"). While the Secured Lender's acceptance of the Prepackaged Plan is subject to such amendments, the Debtor did not resolicit the Prepackaged Plan to the holders of TruPS Claims as the amendments did not affect the treatment of the TruPS Claims under the Prepackaged Plan.

# I.
## THE COMPANY'S BUSINESS

### A.    *General Business*

6.    The Debtor was incorporated as a Delaware corporation on March 12, 1999, as GIBC, Inc. and subsequently changed its name to "Nexity Financial Corporation" on March 26, 1999.

7.    The Debtor is the holding company for Nexity Bank. As such, the Debtor is regulated by the Federal Reserve Board as a bank holding company under the Bank Holding Company Act of 1956 (as amended, the "BHC Act"). Nexity Bank is headquartered in Birmingham, Alabama with additional correspondent banking offices in Atlanta, Georgia; Myrtle Beach and Columbia, South Carolina; Dallas, Texas; Orlando, Florida; Milwaukee, Wisconsin; and Charlotte and Raleigh, North Carolina. The Debtor acquired all of the outstanding common stock of Peoples State Bank, Grant, Alabama, on November 1, 1999, and the name of Peoples State Bank was changed to "Nexity Bank" on January 5, 2000. The branch in Grant, Alabama continued to operate as a traditional bank under the name "Peoples State Bank" until December 31, 2000, when the assets and liabilities of the Grant Branch were sold.

8.    Nexity Bank is an Alabama state-chartered bank that is not a member of the Federal Reserve System. Its primary regulators are the Federal Deposit Insurance Corporation (the "FDIC") and the Alabama State Banking Department (the "Banking Department"). Nexity Bank conducts deposit business in all 50 states in the United States and conducts loan business primarily in the southeastern United States and Texas.

### B.    *Banking Operations*

9.    The Company competes in two areas of the commercial banking industry: correspondent banking and Internet banking.

### (i) *Correspondent Banking*

10.     Nexity Bank provides correspondent banking services to community banks primarily in the southeastern United States and Texas. These services include loan participations, investment services, and clearing and cash management services.

11.     Nexity Bank generates approximately 75% of its loan production through loan participations, bank stock loans, bank holding company loans, and other types of loans to banks. Loan participations are loans purchased from community banks because the community bank could not make the full amount of the loan on its own. The primary reasons that a community bank sells loan participations are because the loan exceeds such community bank's legal lending limit, it wishes to manage liquidity, or for other special needs. Nexity Bank's correspondent lenders focus primarily on small and medium-sized banks in Alabama, Florida, Georgia, North Carolina, South Carolina, and Texas.

12.     The loans generated through community bank participations are typically real estate construction loans, commercial real estate loans, and loans secured by common stock of community banks. Construction and commercial real estate loans typically exceed the community bank's legal lending limit, and the size of the loan participation is usually between $1 million and $5 million. Nexity Bank underwrites each loan participation purchased using standard underwriting policies and procedures. These loans are geographically dispersed through the Company's market areas, resulting in no significant concentration in one small geographic region or state. Nexity Bank manages its risk by making loans on owner-occupied or income producing properties and by requiring collateral values that exceed the loan amount, adequate cash flow to service the debt, and in most cases, the personal guarantees of principals of the borrowers.

13.     Nexity Bank provides investment services to community banks including fixed income securities sales, investment portfolio management services, including bond accounting

4

and safekeeping, and asset/liability management services. Nexity Bank's investment sales team markets primarily U.S. Treasury and Agency securities, including mortgage-backed securities products and municipal securities. Investment representatives also provide portfolio management strategies to community banks. Nexity Bank also offers bond portfolio accounting and safekeeping services, as well as asset/liability management services. Nexity Bank's primary asset/liability management services are interest-rate risk modeling and consulting on strategies for effective balance sheet management.

14.     Nexity Bank's clearing and cash management services allow community banks to outsource their daily funds management. Nexity Bank will automatically invest or borrow federal funds through an account that is linked to its accounts with the Federal Reserve Bank. Community banks can access their intra-day account information via the Internet. The online system allows them to perform wire transfers, ACH transactions, currency and coin orders, and other important banking operations. This system also allows access to critical loan participation accounting information and bond accounting and safekeeping reports.

**(ii)     *Internet Banking***

15.     On January 5, 2000, Nexity Bank received approval from the FDIC to initiate Internet banking operations and such operations began from the Company's office in Birmingham, Alabama on February 22, 2000.

16.     Nexity Bank also provides deposit products and services to consumers and small businesses via the Internet. The Internet provides an efficient distribution channel for serving deposit customers across the United States. Nexity Bank uses the Internet to provide advantages to customers desiring to purchase financial products with typically more attractive rates than are available through traditional banking channels, together with easy access to account and product information. Customers may access Nexity Bank on a 24/7 basis through any Internet service

5

provider by means of an acceptable secure Web browser or by telephone or U.S. mail. Customers can access funds using ATM or debit cards. Customers may review account activity, enter transactions into an on-line account register, pay bills electronically and print bank statement reports, all on a real-time basis.

17.     Nexity Bank also markets home equity loan products to consumers through the Internet. Home equity loan products account for approximately 5.6% of loans outstanding. Nexity Bank uses credit scoring systems in the underwriting process as well as external service providers for loan documentation and closing processes.

### C.     *Competition*

18.     All aspects of the Company's business are highly competitive. Generally, the Company competes with other financial institutions including large banks in major financial centers and other financial intermediaries, such as savings and loan associations, credit unions, consumer finance companies, investment companies, mutual funds, other mortgage companies and financial services operations of major commercial and retail corporations. Competition among financial institutions is based on a variety of factors including interest rates offered on deposit accounts, interest rates charged on loans, credit and service charges, the quality of service rendered, and the convenience of service delivery.

### D.     *Supervision and Regulation*[4]

19.     Bank holding companies and banks are regulated extensively under both federal and state law. The bank regulatory framework is intended primarily for the protection of depositors, the deposit insurance system, and the banking system, and not for the protection of shareholders or any other group. In addition, certain present or potential activities of the Debtor and

---

[4]     A more thorough discussion of the supervision and regulation to which the Company is subject to is contained in Article II.D of the Disclosure Statement.

Nexity Bank are subject to various securities and insurance laws and are regulated by the Securities and Exchange Commission (the "SEC") and the securities and insurance regulators of the states in which the Company operates. Accordingly, a change in applicable statutes, regulations or regulatory policy may have a material effect on the business of the Company.

20.     The Debtor is registered as a bank holding company with the Federal Reserve Board and is subject to examination, regulation and supervision by the Federal Reserve Board under the BHC Act. Accordingly, the Debtor is required to file annual reports and such additional information as the Federal Reserve Board may require. Federal and state laws regulate the Debtor's corporate governance, its investment authority, its manner of doing business, its employment practices, its consumer privacy policies and procedures, its relationship with Nexity Bank and its other affiliates, its ability to merge with, acquire, or be acquired by other entities, its requisite minimum capital and the forms of capital, its payment of dividends or other distributions, the types of businesses in which it can engage, and many other aspects of its business.

21.     Nexity Bank, an Alabama state banking corporation, is subject to supervision and examination by the FDIC and the Banking Department. Nexity Bank is also subject to various requirements and restrictions under federal and state law, including requirements to maintain minimum amounts of capital and reserves against deposits, requirements under the Community Reinvestment Act, restrictions on the types and amounts of loans that may be made and the interest that may be charged thereon and limitations on the types of investments that may be made, activities that may be engaged in, and types of services that may be offered. The operations of Nexity Bank are also affected by various consumer laws and regulations, including those relating to equal credit opportunity, truth in savings disclosures, debt collection laws, privacy regulations, and regulation of consumer lending practices. In addition to the impact of direct regulation, commercial banks are affected significantly by the actions of the Federal Reserve Board as it attempts to control the

7

money supply and credit availability in order to achieve price stability while maintaining economic growth.

22. Strict compliance at all times with state and federal banking laws, as well as other laws, is and will continue to be required. The Debtor believes that the experience of Nexity Bank's executive management will assist it in its continuing efforts to achieve the requisite level of compliance. Certain provisions of state law may be preempted by existing and future federal laws, rules and regulations and no prediction can be made as to the impact of preemption on state law or the regulation of Nexity Bank thereunder.

## III.
## CAPITAL STRUCTURE

### A. *Revolving Credit Agreement*

23. The Debtor is a party to a revolving credit facility (the "Credit Facility") pursuant to that certain Credit Agreement dated December 18, 2007, as amended by the Amendment to Credit Agreement, Waiver and Reaffirmation of Pledge Agreement dated as of March 1, 2009 and the Second Amendment to Credit Agreement, Waiver and Reaffirmation of Pledge Agreement dated as of August 31, 2009 (the "Revolving Credit Agreement"), between the Debtor and Bank of America, N.A. (the "Secured Lender"), as successor to LaSalle Bank National Association. As of June 30, 2010, the Debtor owed the Secured Lender $14.2 million in principal amount plus accrued interest of $350,802 in connection with the Credit Facility. The common stock of Nexity Bank held by the Debtor is pledged as collateral under the Credit Facility.

### B. *Trust Preferred Securities (TruPS)*

24. In 2004 and 2008, the Debtor's wholly owned trusts, Nexity Capital Trust II and Nexity Capital Trust III (the "Trusts"), issued $12 million and $10 million, respectively, in trust preferred securities (the "TruPS"). Under the documents establishing the Trusts, the Trusts issued the TruPS and with those proceeds each purchased a debenture from the Debtor. Payments by the

8

Debtor on the debenture to each Trust in turn provide funds to the Trust to pay interest and principal on the TruPS. The Debtor is permitted to suspend payments on the debentures for up to five years, and, beginning with the payment dates of July 1, 2009 and July 23, 2009, it deferred three of its quarterly interest payments in 2009 to each Trust. As of June 30, 2010, the Debtor had outstanding in the aggregate $22 million of TruPS in principal amount plus accrued interest of approximately $1,265,848.

### C.      *Equity Interests*

25.      As of June 25, 2010, the Debtor's authorized capital stock consisted of 800,000 shares of common stock, $0.01 par value per share (the "NFC Common Stock"), of which 7,766,393 shares were outstanding. Additionally, the Debtor had authorized 5,000,000 shares of preferred stock, par value $0.01 per share, none of which was issued and outstanding, and of that amount 15,000 shares of Series A Junior Participating Preferred Stock were reserved for issuance pursuant to the Preferred Rights Agreement described below.

26.      The Debtor has in effect a Preferred Stock Rights Agreement (the "Preferred Rights Agreement") with Registrar and Transfer Company and, in connection therewith, on February 4, 2009, declared a dividend distribution of one preferred stock purchase right (each a "Right") for each outstanding share of NFC Common Stock, par value $0.01 per share. Each Right entitles the registered holder thereof to purchase from NFC a unit consisting of one one-thousandth of a share of a newly created series of the Debtor's Series A Junior Participating Preferred Stock, par value $0.01 per share, at a purchase price of $37.50 per unit, subject to adjustments for "triggering events" and the acquisition of certain minimum amounts of NFC Common Stock in "acquiring persons" as defined in the Preferred Rights Agreement. The Preferred Rights Agreement provides that the Rights may be redeemed at a redemption price of $0.001 per Right in cash or NFC Common Stock. Based upon 7,766,394 shares of NFC Common Stock outstanding, the Debtor is in

process of redeeming the Rights for an aggregate cash payment of $7,767.00, pursuant to which the Preferred Rights Agreement will be terminated.

**D.** *Additional Claims*

27. The Debtor does not believes that there will be any Class 4 General Unsecured Claims under the Prepackaged Plan existing as of the Petition Date. Additionally, the Debtor does not believe that there are any secured claims (Class 3 Other Secured Claims under the Prepackaged Plan) against the estate, other than the Secured Lender's claims (which is a Class 2 Secured Lender Claim under the Prepackaged Plan) under the Revolving Credit Agreement.

## IV.
## EVENTS LEADING TO CHAPTER 11 FILING

**A.** *2009 Financial Results*

28. Nexity had a consolidated net loss for 2009 of $62.0 million, compared to a loss of $13.0 million in 2008. The primary factors affecting the higher net loss in 2009 were increases in Nexity's provision for loan losses of $23.1 million or 80.7%, noninterest expenses of $5.5 million or 20.4%, and an $8.0 million or 44.0% decrease in net interest income.

29. Moreover, Nexity's credit quality continued to deteriorate in 2009 due to the economic recession and a challenging real estate market. The provision for loan losses was $51.8 million, $28.7 million, and $805,000 in 2009, 2008, and 2007, respectively. The provision for loan losses was $23.1 million higher in 2009 primarily because of higher net charge-offs. Net loan charge-offs were $44.4 million, or 7.01% of average loans in 2009 compared to $21.6 million, or 3.15% of average loans in 2008 and $423,467, or 0.07% of average loans in 2007. The allowance for loan losses totaled 4.22% of total loans as of December 31, 2009 compared to 2.22% of loans as of December 31, 2008, and 1.24% as of December 31, 2007. As of December 31, 2009, nonperforming assets as a percent of total loans and other real estate owned increased to 21.59% from 13.14% at December 31, 2008.

RLF1 3588277v. 2

30.     Nexity Bank had a Tier 1 Leverage Ratio of 2.49% and 7.05% at December 31, 2009 and 2008, respectively, and a Tier 1 Risk-Based Capital Ratio[5] of 5.75% and 10.33% at December 31, 2009 and 2008, respectively. As of March 31, 2010, Nexity Bank's Tier 1 Leverage Ratio was 2.49%, its Tier 1 Risk-Based Capital Ratio was 4.25% and its Total Risk-Based Capital Ratio was 5.75%. Under the FDIC's capital standards, a bank is "significantly undercapitalized" if the bank has a Total Risk-Based Capital Ratio of less than 6.0 percent or a Tier 1 Leverage Ratio that is less than 3.0 percent or a Tier 1 Risk-Based Capital Ratio that is less than 3.0 percent. Under this definition, Nexity Bank's capital ratios place it in the significantly undercapitalized category.

31.     As of February 9, 2009, the Debtor voluntarily delisted and deregistered, and ceased to file reports and other information with the SEC.

**B.      *Regulatory Considerations***

32.     On March 20, 2009, Nexity Bank entered into a Stipulation and Consent to the Issuance of an Order to Cease and Desist (the "C&D Order") with the FDIC and the Banking Department, requiring that Nexity Bank and its affiliates, successors and assigns to cease and desist from certain unsafe and unsound banking practices, as described below. Among other things, the C&D Order requires Nexity Bank to:

(a)     Have and retain qualified management of Nexity Bank and assess management and staffing needs, qualifications and performance;

(b)     Assure the on-going participation by Nexity Bank's Board of Directors in the affairs of Nexity Bank;

(c)     Present a written capital plan to the FDIC and the Banking Department by April 30, 2009 by which Nexity Bank would achieve a Tier 1 Leverage Ratio of not less than 8 percent and a Total Risk-Based Capital Ratio of not less than 12 percent by June 30, 2009;

---

[5] The term "Tier 1 Risk-Based Capital Ratio" means the ratio of qualifying total capital to risk-weighted assets, as calculated in accordance with the appropriate banking agency's capital regulations.

(d)     Eliminate from Nexity Bank's books by charge-off or collection all assets classified Loss and within thirty (30) days of receipt of any future report of examination eliminate the remaining balance of any assets classified by Nexity Bank as "Loss" and 50 percent of assets classified by Nexity Bank as "Doubtful";

(e)     Formulate and implement a plan to reduce Nexity Bank's risk exposure in classified assets and to reduce assets classified "substandard" in relation to Tier 1 Capital plus the allowance for loan losses to not more than 110 percent within 180 days, to not more than 75 percent within 360 days, to not more than 50 percent within 540 days and to continue to reduce the volume of such assets after that date;

(f)     Cease to extend additional credit to any borrower who has a loan or extension of credit with Nexity Bank that is classified by Nexity Bank as "Loss" or "Doubtful" and not make further extensions of credit to any borrower whose loans are classified by Nexity Bank as "Substandard" unless Nexity Bank's board or appropriate committee determines that not doing so would be detrimental to Nexity Bank;

(g)     Revise and adopt a lending policy to address all items of criticism and Nexity Bank's procedures for making and monitoring loans and develop a program of independent loan review to provide for identification and review of problem credits;

(h)     Analyze and reduce credit concentrations;

(i)     Revise Nexity Bank's policy for determining the allowance for loan losses and provide for a review by Nexity Bank's Board of Directors of the adequacy of such allowance at least once each calendar quarter;

(j)     Develop and implement a written plan to improve Nexity Bank's earnings;

(k)     Adopt and implement a plan regarding Nexity Bank's liquidity, including a weekly review of liquidity;

(l)     Not pay cash dividends without the prior written consent of the FDIC and the Banking Department;

(m)    Not increase the amount of brokered deposits above the amount outstanding as of the date of the C&D Order and adopt and implement a written plan for reducing Nexity Bank's reliance on brokered deposits;

(n)     Correct violations of law previously identified; and

(o)     Develop and implement a strategic plan to improve Nexity Bank's performance, appoint a committee of the Board of Directors that is responsible for ensuring compliance with the C&D Order and provide

12

progress reports to the FDIC and the Banking Department on Nexity Bank's compliance with the C&D Order.

33.     Effective June 9, 2009, the Debtor consented to the issuance of a Cease and Desist Order (the "Federal Reserve Order") by the Board of Governors of the Federal Reserve System (the "Federal Reserve Board") and the Banking Department. The Federal Reserve Order requires, among other things, that the Debtor refrain from paying dividends, taking any action that would reduce Nexity Bank's capital, and making any distributions of interest, principal, or other sums on subordinated debentures or TruPS without prior written regulatory approval.

34.     The Federal Reserve Order generally provides for the development and implementation of actions to ensure that the Debtor's wholly owned subsidiary, Nexity Bank, complies with the C&D Order and any other supervisory action taken by Nexity Bank's federal or state regulators. Among other things, the Federal Reserve Order requires the Debtor to:

(a)     Present a written capital plan to the Federal Reserve Board and the Banking Department within 30 days of the Federal Reserve Order by which the Debtor and Nexity Bank would achieve sufficient capital to meet current and future capital requirements, including compliance with the Capital Adequacy Guidelines for Bank Holding Companies and the applicable adequacy guidelines for Nexity Bank issued by the FDIC;

(b)     The Debtor shall not declare or pay dividends without the prior written approval of the Federal Reserve Board and the Banking Department, nor shall it directly or indirectly take dividends or any other form of payment representing a reduction in capital from Nexity Bank without the prior written approval of the Federal Reserve Board and the Banking Department;

(c)     The Debtor shall not make any distributions of interest, principal or other sums on subordinated debentures or TruPS without the prior written approval of the Federal Reserve Board and the Banking Department;

(d)     The Debtor shall not, directly or indirectly, incur, increase or guarantee any debt, nor purchase or redeem any shares of its stock, without the prior written approval of the Federal Reserve Board and the Banking Department;

(e)     The Debtor will comply with applicable notice provisions in connection with the appointment of any new director or senior executive officer or a change in the responsibilities of any senior executive officer so that the officer would

assume a different executive officer position. The Debtor will also comply with applicable restrictions on indemnifications and severance payments; and

(f)     Within 30 days after the end of each quarter following the date of the Federal Reserve Order, the Debtor's Board of Directors shall submit to the Federal Reserve Board and the Banking Department written progress reports detailing the form and manner of all actions taken to secure the Debtor's compliance with the provisions of the Federal Reserve Order and the results thereof.

35.     As the foregoing orders demonstrate, it is imperative that the Debtor raise additional capital. Failure by Nexity Bank to comply with the C&D Order, or failure by the Debtor to comply with the Federal Reserve Order, may result in additional regulatory sanctions against Nexity Bank or the Debtor. These could include placing Nexity Bank into receivership.

36.     The restriction on payments of dividends by Nexity Bank to the Debtor, due to continuing losses in Nexity Bank, general regulatory restrictions and the prohibitions set forth in the C&D Order, has placed significant pressure on the Debtor's ability to service its debt requirements on its secured debt and the TruPS. This debt service will be exceedingly difficult for the Debtor in the short term, and nearly impossible in the long-term. The Debtor has defaulted on a number of covenants with the Secured Lender and has sought waivers for such default, and the Debtor has suspended payments of interest to its TruPS holders. Although the Debtor is permitted to suspend interest payments to its TruPS holders for up to 20 quarters, without incurring a default under the relevant TruPS documents, the Debtor does not expect to be able to resume interest payments to its TruPS holders, and eventually to repay the principal, under current conditions.

**C.     *Prepetition Restructuring Efforts***

37.     As a result of the significant losses and reduction of capital which the Debtor and Nexity Bank have experienced over the past two years, combined with the restrictions imposed upon them under both the Federal Reserve Order and the C&D Order, the Debtor has spent the past 18 months exploring various capital raising alternatives. As part of such efforts, the Debtor has pursued an "out of court" restructuring, which would include, among other things, (i) raising at least

14

$175 million in new equity capital through a private placement of up to 800 million shares of NFC Common Stock, (ii) an agreement by the Secured Lender to discharge the outstanding principal and interest owed under the Revolving Credit Agreement for a discounted amount and (iii) with the agreement of the Secured Lender, repurchasing all of the TruPS for a percentage of their stated liquidation amount. While the Debtor has obtained the affirmative consent of the Secured Lender and the majority of TruPS holders to the proposed restructuring, the Debtor has not received the unanimous acceptance of *all* TruPS holders necessary to effectuate the recapitalization without court involvement. Accordingly, the Debtor determined that it was necessary to commence a prepackaged chapter 11 case to accomplish a restructuring of its debt and to facilitate the recapitalization of Nexity Bank's operations.

## V.
## THE PREPACKAGED PLAN

38.      On July 1, 2010, the Debtor began soliciting votes on the Prepackaged Plan. The Prepackaged Plan sets forth the Debtor's capital structure after the effective date of the Prepackaged Plan (the "Effective Date") and the distribution each class of the Debtor's creditors and equity holders is to receive under the Prepackaged Plan. Specifically, upon the Effective Date, among other things:

(a)      **Secured Lender Claim (Class 2).**  The Secured Lender shall receive, in full and final satisfaction of its claim (except with respect to certain Surviving Contingent Obligations) a Cash payment of $3,820,500 (the "Secured Lender Cash Payment") unless the Secured Lender elects to receive all or any portion of the Secured Lender Cash Payment in shares of NFC Common Stock, with such shares of NFC Common Stock valued for such purpose at the gross per share price generally paid for NFC Common Stock in connection with the NFC Stock Offering.

(b)      **Other Secured Claims (Class 3).**  The legal, equitable and contractual rights of each holder of Allowed Other Secured Claims shall remain unaltered by the Prepackaged Plan so as to leave such Claim unimpaired, and such Claim shall not be discharged by the Prepackaged Plan.

15

(c)     **General Unsecured Claims (Class 4).**     The legal, equitable and contractual rights of each holder of Allowed General Unsecured Claims shall remain unaltered by the Prepackaged Plan so as to leave such Claim unimpaired, and such Claim shall not be discharged by the Prepackaged Plan.

(d)     **TruPS Claims (Class 5).**     Assuming that Class 5 votes to accept the Prepackaged Plan, as agreed to by the Secured Lender, each holder of an Allowed TruPS Claim shall receive, in full and final satisfaction of such Claim, a Cash payment (the "TruPS Cash Payment") equal to $150.00 per $1,000 (15%) of the liquidation amount of the TruPS, as set forth in the Trust Documents, unless the holder of an Allowed TruPS Claim elects (the "TruPS Holder Stock Election") to receive all or any portion of the TruPS Cash Payment in shares of NFC Common Stock, with shares of NFC Common Stock valued for such purpose at the gross per share price generally paid for NFC Common Stock in connection with the NFC Stock Offering.  In the event that Class 5 does not vote to accept the Prepackaged Plan, the TruPS Holder Stock Election shall not be available and all TruPS Claims shall be cancelled and discharged without any distribution.

(e)     **NFC Common Equity Interests (Class 6).**  The holders of NFC Common Equity Interests shall not receive any distribution under the Prepackaged Plan on account of their Allowed NFC Common Equity Interest; provided, however, that, as agreed to by the Secured Lender, all holders of Allowed NFC Common Equity Interests shall retain their shares of NFC Stock under the Plan diluted by shares issued pursuant to the NFC Stock Offering with the holders of NFC Common Equity Interests holding, in the aggregate, not more than one percent of the NFC Common Stock after the Effective Date and subject to any reverse stock split provided for in the Restated Certificate of Incorporation.

(f)     **Section 510(b) Claims (Class 7).**  The Section 510(b) Claims shall be cancelled and discharged without any distribution.

39.     Separately, but subject to and conditioned upon approval and consummation of the Prepackaged Plan, the Debtor is in the process of raising a gross amount of at least $175 million in new capital through the sale of additional shares of NFC Common Stock.  These additional funds will be used to make the distributions contemplated under the Prepackaged Plan, pay the costs and expenses associated with the Chapter 11 Case and the transactions related to the recapitalization, support the Debtor's ongoing working capital needs and contribute the urgently needed capital to the Debtor and Nexity Bank.

16

# VI.
## SUMMARY OF FIRST DAY PLEADINGS

40.    Concurrently with the filing of the Chapter 11 Case, the Debtor has filed a number of First Day Pleadings, which the Debtor believes are necessary to enable it to operate in chapter 11 with minimum disruption and loss of productivity.  The Debtor respectfully requests that the relief requested in each of the First Day Pleadings be granted as they are a critical element in stabilizing and facilitating the Debtor's operations during the pendency of the Chapter 11 Case.  A description of the relief requested and the facts supporting each of the First Day Pleadings is set forth below.  Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Pleading.

A.    *Debtor's Motion for Entry of an Order (I) Authorizing Debtor to Continue Use of Cash Management System, Bank Accounts and Business Forms, (II) Authorizing Debtor to Continue Engaging in Ordinary Course Intercompany Transactions and (III) Extending the Debtor's Time to Comply with Section 345 of the Bankruptcy Code*

41.    In the ordinary course of business, the Debtor utilizes a centralized cash management system to collect funds and disburse them to pay operating expenses (collectively, the "Cash Management System").  The Cash Management System provides a cost-effective and efficient means of managing the Debtor's finances, and maintenance of the Cash Management System will benefit all creditors by reducing the daily operating expenses of the Debtor's estate. Failure to continue the Cash Management System would disrupt the Debtor's operations and impose a financial and administrative burden on the estate.  As of the Petition Date, the Debtor maintained with two banks (the "Cash Management Banks") three bank accounts described below (the "Bank Accounts").  The Debtor maintains that all of the Bank Accounts are in financially stable banking institutions with FDIC or FSLIC insurance (up to an applicable limit on each account).   The principal components of the Cash Management System are described below.

17

(a)    Bank of America Money Market Account:  The Debtor maintains a money market at Bank of America, N.A. (the "BofA Account").  The BofA Account was previously used by the Debtor to make monthly interest payments on the debt owed to Bank of America, N.A. (under the Revolving Credit Agreement).  This account is currently maintained for general corporate purposes.

(b)    Nexity Bank Checking Account:  The Debtor maintains an operating checking account with Nexity Bank (the "Nexity Checking Account") which is primarily used to pay monthly expenses.  Federal and state tax refunds and payments are received in and paid from the Nexity Checking Account.

(c)    Nexity Bank Money Market Account:  The Debtor also maintains a money market account at Nexity Bank (the "Nexity Money Market Account").  This particular account earns interest monthly.  Funds from the Nexity Money Market Account are transferred to the Nexity Checking Account as needed.

42.    In the ordinary course of business, the Debtor uses numerous varieties of business forms.  To minimize expenses to its estate and avoid confusion on the part of employees and creditors, the Debtor respectfully requests that the Court authorize the Debtor to continue to use all correspondence and business forms (including, without limitation, letterhead and invoices) as such forms were in existence immediately before the Petition Date without reference to the Debtor's status as a debtor in possession; provided, however, that the Debtor will obtain new business form stock reflecting its status as a debtor-in-possession once all existing business form stock on hand is exhausted (if applicable, given the anticipated length of the chapter 11 case).  With such authorization, the Debtor will be able to avoid the expense and delay of ordering entirely new business forms.

43.    Further, the Debtor engages in a variety of intercompany transfers and transactions (the "Intercompany Transactions") with its affiliate, Nexity Bank.  For instance, most operating expenses of the Debtor are paid using Nexity Bank's automated accounts payable system.  Such payments are booked by Nexity Bank to a receivable account on its general ledger, and the Debtor reimburses Nexity Bank, via journal entries, in the ordinary course.  The Debtor likewise transfers funds to Nexity Bank and receives transfers of funds in the ordinary course.  The Debtor

18

believes that its ability to continue to engage in these Intercompany Transactions in the ordinary course is important to the Debtor's business operations.

**B.** ***Debtor's Motion Pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure and Local Rule 1007-1 for an Order (I) Extending the Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, Lists of Equity Security Holders, Schedules of Current Income and Expenditures and Statements of Financial Affairs, and (II) Waiving the Requirements to File Same Upon Confirmation of the Prepackaged Plan of Reorganization***

44.     The Debtor has filed a motion requesting entry of an order (i) extending the time within which to file the Debtor's (i) schedules of assets and liabilities; (ii) schedules of executory contracts and unexpired leases; (iii) lists of equity holders; (iv) schedules of current income and expenditures; and (v) statements of financial affairs (collectively, the "Schedules and Statements") for an additional seventy-six (76) days to October 20, 2010 (for a total of ninety (90) days from the Petition Date), and (ii) waiving the requirement to file the Schedules and Statements upon entry of an order confirming the Plan, so long as the Debtor does not seek to establish a claims bar date.

45.     The Debtor's total number of creditors does not exceed two-hundred (200) and, therefore, the Debtor must file its Schedules and Statements within fourteen (14) days of the Petition Date.  Therefore, the Debtor respectfully requests that the Court extend such fourteen (14) day period to ninety (90) days from the Petition Date, without prejudice to the Debtor's ability to request additional extensions should it become necessary.

46.     Furthermore, the Prepackaged Plan provides for the payment in full of all Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, and Allowed General Unsecured Claims.  Accordingly, the creditors falling within these classes under the Prepackaged Plan do not need schedules to determine how their claim is being treated, and will not be prejudiced by any extension in the deadline to file the Schedules and Statements.  The Prepackaged Plan is

19

likewise clear as to the treatment of those claims being impaired thereunder (the Secured Lender Claim, the TruPS Claims and the Section 510(b) Claims) and the allowed amount of such claims for voting and distribution purposes. Accordingly, the Debtor submits that upon confirmation of the Prepackaged Plan, the Schedules and Statements will provide no benefit to creditors that could justify incurring the costs of creating them and, accordingly, the requirement of filing the Schedules and Statements should be waived at that time.

47.     To prepare the Schedules and Statements, the Debtor would have to compile information from books, records, and documents relating to the claims of its potential creditors, as well as the Debtor's numerous assets and contracts. This information is voluminous and assembling the necessary information would require a significant expenditure of time and effort on the part of the Debtor and its employees in the near term, when these resources would be best put toward effectuating the Debtor's reorganization efforts.

**C.     *Debtor's Motion Pursuant to 11 U.S.C. §§ 105(a), 1125, 1126, and 1128, and Fed. R. Bankr. P. 2002, 3017, 3018, and 3020 for Entry of an Order (I) Scheduling a Combined Hearing to Consider Approval of Disclosure Statement, Solicitation Procedures and Form of Ballots, and Confirmation of Debtor's Prepackaged Plan of Reorganization and Establishing Objection Deadlines with Respect Thereto; (II) Approving the Form and Manner of Notice of Commencement of This Chapter 11 Case, Combined Hearings, Related Deadlines, and Assumption and Rejection of Executory Contracts and Unexpired Leases Pursuant to Debtor's Prepackaged Plan of Reorganization; and (III) Granting Related Relief***

48.     The Debtor seeks the entry of an order (i) scheduling a combined hearing (the "Combined Hearing") to consider (a) approval of the Disclosure Statement, (b) approval of the Solicitation Procedures and the forms of Ballots and (c) confirmation of the Prepackaged Plan, including any proposed amendments or modifications to the Prepackaged Plan, (ii) establishing the deadline to object to the adequacy of the Disclosure Statement, the Solicitation Procedures, the Ballots, and confirmation of the Prepackaged Plan; (iii) authorizing and approving the form and manner of notice of the commencement of the Chapter 11 Case, the Combined Hearing, and the

20

assumption and rejection of executory contracts and unexpired leases pursuant to the Prepackaged Plan; and (iv) granting related relief.

49.    Below is a timetable highlighting the dates relevant to the Solicitation Procedures and setting forth the Debtor's proposed dates for (i) the mailing of the Combined Notice (as defined below), (ii) the objection and reply deadlines with respect to the Disclosure Statement, the Solicitation Procedures, the Ballots, and confirmation of the Prepackaged Plan, and (iii) the Combined Hearing:

| Timetable | |
| --- | --- |
| Commencement of Solicitation | July 1, 2010 |
| Voting Deadline | July 21, 2010 |
| Petition Date | July 22, 2010 |
| Mailing of Combined Notice | July 27, 2010 |
| Prepackaged Plan/Disclosure Statement Objection Deadline | August 24, 2010 at 4:00 p.m. (prevailing Eastern Time) |
| Prepackaged Plan/Disclosure Statement Reply Deadline | August 26, 2010 at 12:00 p.m. (noon) (prevailing Eastern Time) |
| Combined Hearing | August 27, 2010 |

50.    As noted above, the Debtor commenced solicitation prior to the Petition Date and obtained the requisite acceptances of the Prepackaged Plan prior to the Petition Date. The classes consisting of holders of claims materially affected by the Prepackaged Plan have already accepted the Prepackaged Plan in excess of the statutory thresholds. The Prepackaged Plan contemplates an expeditious emergence from chapter 11 and the Debtor intends to proceed accordingly. Accordingly, the Debtor submits that the proposed timetable set forth above is appropriate under the circumstances.

21

51.    I respectfully request that the Court grant all relief requested in the First Day Pleadings and such and other further relief as may be just.

Dated: July 22, 2010

By:_____
Greg L. Lee
Chairman of the Board and Chief Executive
Officer of Nexity Financial Corporation