## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
                         :

**In re**                      :        **Chapter 11**
                         :

**NEXITY FINANCIAL CORPORATION,**[1]  :        **Case No. 10-_____ (___)**
                       :

        **Debtor.**           :
                       :

------------------------------------------------------------x

## DISCLOSURE STATEMENT RELATING TO THE PREPACKAGED PLAN OF REORGANIZATION OF NEXITY FINANCIAL CORPORATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Jason M. Madron (No. 4431)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

ATTORNEYS FOR NEXITY
FINANCIAL CORPORATION

Dated: July 1, 2010
      Wilmington, Delaware

---

[1] The last four (4) digits of the Debtor's federal identification number are 2937.  The Debtor's principal place of business is located at 3680 Grandview Parkway, Suite 200, Birmingham, Alabama 35243.

[INSERT LETTER FROM MANAGEMENT]



Greg L. Lee

*Chairman/CEO*

3680 Grandview Parkway
Suite 200
Birmingham, AL 35243
(205) 298-6410
(205) 298-6559(fax)
www.nexitybank.com

This letter provides some important information regarding the enclosed Prepackaged Plan of Reorganization of Nexity Financial Corporation (the "Company") Under Chapter 11 of the Bankruptcy Code (the "Prepackaged Plan").

In the course of management's efforts to recapitalize the Company and its subsidiary bank, Nexity Bank ("Bank"), potential investors clearly have indicated that the debt at the Company must be resolved in order to allow for an equity infusion transaction to occur. Management has negotiated in good faith with all of our debt holders and appreciate many of the debt holder's agreement with respect to the Company's "out-of-court" restructuring settlement proposal. Unfortunately, as a result of being unable to obtain the necessary consent of 100% of the holders of our trust preferred securities ("TruPS") to the Company's "out-of-court" restructuring proposal, we are hereby soliciting consents to the Prepackaged Plan from the holders of the TruPS and the Secured Lender, the terms of which are detailed in the attached documents.

Under the Prepackaged Plan, approximately $36.2 million in debt would be fully resolved. The effects of the Prepackaged Plan for Reorganization, if confirmed by the Bankruptcy Court, would significantly improve the Company's capital position and avoid the Bank being placed in receivership and the Company going into liquidation.

**In addition, if the holders of the TruPS as a class vote in favor of the Prepackaged Plan and the Prepackaged Plan is approved by the Bankruptcy Court and consummated, the Secured Lender has agreed to allow such holders to receive a distribution equaling fifteen percent (15%) of the liquidation amount of the TruPS (the TruPS claims are fully subordinated to the claims of the Secured Lender). If, however, the TruPS class votes against the Prepackaged Plan, holders of the TruPS will receive nothing under the Prepackaged Plan.**

The past eighteen months have presented substantial challenges to the Company and the Bank and while our struggles have been significant, it is encouraging to be on the doorstep of a restructuring and recapitalization that will allow the Company to emerge from its significant financial troubles and be in full compliance with the capital requirements of the Cease and Desist

Orders levied on the Company and the Bank by the Federal Reserve Bank, the Federal Deposit Insurance Corporation and the State of Alabama Banking Department.

For the reasons set forth herein and in the accompanying Disclosure Statement and Prepackaged Plan, management of the Company encourages each TruPS holder to vote in favor of the Prepackaged Plan by the voting deadline of 5:00 p.m. (Eastern Time) on July 21, 2010.

Signed,

Greg L. Lee
Chairman and CEO

# LIST OF EXHIBITS

**Exhibit A** - Prepackaged Plan

**Exhibit B** - Liquidation Analysis

**Exhibit C** - Audited Financial Statements

**Exhibit D** - Unaudited Comparative Financial Statements

**Exhibit E** - Financial Projections

THIS SOLICITATION OF VOTES (THE "SOLICITATION") IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF A CHAPTER 11 REORGANIZATION PLAN PRIOR TO THE FILING OF A VOLUNTARY REORGANIZATION CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE DEBTOR HAS NOT COMMENCED A BANKRUPTCY CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AT THIS TIME. BECAUSE NO CHAPTER 11 CASE HAS YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASE, NEXITY FINANCIAL CORPORATION ("NFC" OR THE "DEBTOR") EXPECTS TO SEEK PROMPTLY ORDERS OF THE BANKRUPTCY COURT (i) APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, (ii) APPROVING THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126(b) OF THE BANKRUPTCY CODE AND (iii) CONFIRMING THE PREPACKAGED PLAN DESCRIBED HEREIN.

THE SOLICITATION IS BEING MADE ONLY TO PERSONS WHO ARE "ACCREDITED INVESTORS" (AS DEFINED IN REGULATION D UNDER THE SECURITIES ACT OF 1933).

DISCLOSURE STATEMENT

DATED JULY 1, 2010

PREPETITION SOLICITATION OF VOTES

WITH RESPECT TO THE PREPACKAGED REORGANIZATION PLAN

OF

NEXITY FINANCIAL CORPORATION

FROM THE HOLDERS OF THE

SECURED LENDER CLAIM

AND

TRUST PREFERRED SECURITIES CLAIMS

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PREPACKAGED PLAN IS 5:00 P.M. (EASTERN DAYLIGHT TIME), ON JULY 21, 2010, UNLESS EXTENDED BY NFC. IN ORDER TO BE COUNTED, BALLOTS MUST BE RECEIVED BY THE SOLICITATION AGENT BY THE VOTING DEADLINE.

> The Board of Directors of NFC has unanimously approved the Solicitation, the Prepackaged Plan, and the transactions contemplated thereby, and recommend that all creditors whose votes are being solicited submit ballots to accept the Prepackaged Plan.

UNLESS OTHERWISE DEFINED IN THIS DISCLOSURE STATEMENT, CAPITALIZED TERMS USED HEREIN HAVE THE MEANINGS ASCRIBED TO THEM IN THE PREPACKAGED PLAN.

NFC HAS FURNISHED SOLICITATION MATERIALS TO EACH RECORD HOLDER OF IMPAIRED CLAIMS AS OF THE VOTING RECORD DATE IN CONNECTION WITH NFC'S SOLICITATION OF ACCEPTANCES OF THE PREPACKAGED PLAN DESCRIBED HEREIN PURSUANT TO SECTIONS 1125 AND 1126(B) OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT IS TO BE USED BY EACH SUCH HOLDER OF CLAIMS SOLELY IN CONNECTION WITH ITS EVALUATION OF THE PREPACKAGED PLAN; USE OF THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE IS NOT AUTHORIZED. THIS DISCLOSURE STATEMENT MAY NOT BE REPRODUCED OR PROVIDED TO ANYONE OTHER THAN ADVISORS TO THE RECIPIENT WITHOUT THE PRIOR WRITTEN CONSENT OF NFC.

**NFC HAS NOT COMMENCED A REORGANIZATION CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AS OF THE DATE OF THIS DISCLOSURE STATEMENT. IF, HOWEVER, NFC RECEIVES PROPERLY COMPLETED BALLOTS (THAT ARE NOT SUBSEQUENTLY REVOKED) INDICATING ACCEPTANCE OF THE PREPACKAGED PLAN IN SUFFICIENT NUMBER AND AMOUNT TO MEET THE VOTING REQUIREMENTS PRESCRIBED BY SECTION 1126 OF THE BANKRUPTCY CODE, NFC INTENDS TO FILE (BUT HEREBY EXPRESSLY RESERVES THE RIGHT NOT TO FILE) WITH THE BANKRUPTCY COURT A VOLUNTARY PETITION FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AND TO SEEK, AS PROMPTLY THEREAFTER AS PRACTICABLE, CONFIRMATION OF THE PREPACKAGED PLAN. THE EFFECTIVE DATE OF THE PREPACKAGED PLAN IS EXPECTED TO OCCUR SHORTLY AFTER THE BANKRUPTCY COURT'S ENTRY OF THE CONFIRMATION ORDER.**

**IN THE EVENT THAT THE REQUISITE ACCEPTANCES ARE NOT RECEIVED OR, IF RECEIVED, ARE SUBSEQUENTLY REVOKED PRIOR TO TERMINATION OF THE SOLICITATION, NFC HEREBY RESERVES THE ABSOLUTE RIGHT TO USE ANY AND ALL BALLOTS ACCEPTING THE PREPACKAGED PLAN THAT WERE RECEIVED PURSUANT TO THE SOLICITATION AND NOT SUBSEQUENTLY REVOKED TO SEEK CONFIRMATION OF THE PREPACKAGED PLAN (OR ANY MODIFICATION THEREOF THAT DOES NOT MATERIALLY AND ADVERSELY AFFECT THE TREATMENT OF THE CLASSES OF CLAIMS WITH RESPECT TO WHICH SUCH BALLOTS WERE CAST) PURSUANT TO SECTION 1129(b) OF THE BANKRUPTCY CODE.**

* * * * *

RLF1 3582605v. 5

BECAUSE ACCEPTANCE OF THE PREPACKAGED PLAN WILL CONSTITUTE ACCEPTANCE OF ALL THE PROVISIONS THEREOF, HOLDERS OF CLAIMS ARE URGED TO CONSIDER CAREFULLY THE INFORMATION REGARDING TREATMENT OF THEIR CLAIMS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PREPACKAGED PLAN IS SUBJECT TO MATERIAL CONDITIONS PRECEDENT. SEE ARTICLE X – "THE PREPACKAGED PLAN – CONDITIONS PRECEDENT TO EFFECTIVE DATE." THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS WILL BE SATISFIED.

NFC PRESENTLY INTENDS TO SEEK TO CONSUMMATE THE PREPACKAGED PLAN AND TO CAUSE THE EFFECTIVE DATE TO OCCUR PROMPTLY AFTER CONFIRMATION OF THE PREPACKAGED PLAN. THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PREPACKAGED PLAN AND THE EFFECTIVE DATE ACTUALLY WILL OCCUR. PROCEDURES FOR DISTRIBUTIONS UNDER THE PREPACKAGED PLAN, INCLUDING MATTERS THAT ARE EXPECTED TO AFFECT THE TIMING OF THE RECEIPT OF DISTRIBUTIONS BY HOLDERS OF CLAIMS AND EQUITY INTERESTS IN CERTAIN CLASSES AND THAT COULD AFFECT THE AMOUNT OF DISTRIBUTIONS ULTIMATELY RECEIVED BY SUCH HOLDERS, ARE DESCRIBED IN ARTICLE VII – "THE PREPACKAGED PLAN – PROVISIONS GOVERNING DISTRIBUTIONS."

* * * * *

IF THE REQUISITE ACCEPTANCES ARE NOT RECEIVED, NFC BELIEVES THAT IT MAY BE FORCED TO PURSUE A TRADITIONAL, NON PREPACKAGED CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THERE CAN BE NO ASSURANCE, HOWEVER, THAT NFC WILL BE ABLE TO EMERGE SUCCESSFULLY FROM A MORE TRADITIONAL CHAPTER 11 CASE AND MAY BE FORCED TO LIQUIDATE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE. NFC BELIEVES THAT IF IT LIQUIDATES UNDER CHAPTER 7, THE VALUES OF THE ASSETS AVAILABLE FOR DISTRIBUTION TO CREDITORS WOULD BE SIGNIFICANTLY LOWER THAN THE VALUES OF THE DISTRIBUTIONS CONTEMPLATED UNDER THE PREPACKAGED PLAN. MOREOVER, NFC BELIEVES THAT THE MOST LIKELY RESULT WOULD BE REGULATORY SEIZURE OF VIRTUALLY ALL OF NFC'S ASSETS IN A LIQUIDATION, THEREBY ELIMINATING ANY RECOVERY FOR THE HOLDERS OF CLAIMS AND EQUITY INTERESTS AGAINST NFC.

* * * * *

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PREPACKAGED PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PREPACKAGED PLAN, ANTICIPATED EVENTS IN NFC'S CHAPTER 11 CASE, AND FINANCIAL INFORMATION. ALTHOUGH NFC BELIEVES THAT THE PREPACKAGED PLAN AND RELATED DOCUMENTS AND STATUTORY PROVISION SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED

iii

IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. NFC IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL PROJECTIONS AND OTHER FINANCIAL INFORMATION, IS WITHOUT ANY INACCURACY OR OMISSION.

IN DETERMINING WHETHER TO VOTE TO ACCEPT THE PREPACKAGED PLAN, HOLDERS OF CLAIMS MUST RELY ON THEIR OWN EXAMINATION OF NFC AND THE TERMS OF THE PREPACKAGED PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION, THE PREPACKAGED PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY. SEE ARTICLE V.C. – "CERTAIN PLAN-RELATED RISK FACTORS TO BE CONSIDERED" FOR A DISCUSSION OF VARIOUS FACTORS THAT SHOULD BE CONSIDERED IN CONNECTION WITH THE PREPACKAGED PLAN.

\* \* \* \* \*

NEITHER THIS DISCLOSURE STATEMENT NOR THE PREPACKAGED PLAN DESCRIBED HEREIN HAS BEEN FILED WITH OR REVIEWED BY, AND THE NFC COMMON STOCK HAS NOT BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS. THE PREPACKAGED PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

NEITHER THIS DISCLOSURE STATEMENT NOR THE PREPACKAGED PLAN DESCRIBED HEREIN CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITIES IN CONNECTION WITH THE NFC STOCK OFFERING. THE SECURITIES THAT WILL BE OFFERED IN THE NFC STOCK OFFERING WILL NOT BE REGISTERED WITH THE SEC AND MAY NOT BE OFFERED OR SOLD ABSENT REGISTRATION OR AN APPLICABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

THE PROJECTED FINANCIAL INFORMATION REGARDING THE REORGANIZED DEBTOR AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES AND RISKS DESCRIBED HEREIN, ALL OF WHICH ARE BASED ON VARIOUS ESTIMATES AND ASSUMPTIONS. SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE

iv

VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE RISKS, INCLUDING, AMONG OTHERS, THOSE SUMMARIZED HEREIN. SEE ARTICLE V.E. – "FACTORS AFFECTING THE DEBTOR."

WHEN USED IN THIS DISCLOSURE STATEMENT, THE WORDS "ANTICIPATE," "BELIEVE," "ESTIMATE," "WILL," "MAY," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS GENERALLY IDENTIFY FORWARD-LOOKING STATEMENTS. ALTHOUGH NFC BELIEVES THAT ITS PLANS, INTENTIONS AND EXPECTATIONS REFLECTED IN THE FORWARD-LOOKING STATEMENTS ARE REASONABLE, IT CANNOT BE SURE THAT THEY WILL BE ACHIEVED. THESE FACTORS ARE NOT INTENDED TO REPRESENT A COMPLETE LIST OF THE GENERAL OR SPECIFIC FACTORS THAT MAY AFFECT THE REORGANIZED DEBTOR. IT SHOULD BE RECOGNIZED THAT OTHER FACTORS, INCLUDING GENERAL ECONOMIC FACTORS AND BUSINESS STRATEGIES, MAY BE SIGNIFICANT, PRESENTLY OR IN THE FUTURE, AND THE FACTORS SET FORTH IN THIS DISCLOSURE STATEMENT MAY AFFECT NFC TO A GREATER EXTENT THAN INDICATED. ALL FORWARD-LOOKING STATEMENTS ATTRIBUTABLE TO NFC OR PERSONS ACTING ON ITS BEHALF ARE EXPRESSLY QUALIFIED IN THEIR ENTIRETY BY THE CAUTIONARY STATEMENTS SET FORTH IN THIS DISCLOSURE STATEMENT. EXCEPT AS REQUIRED BY LAW, NFC UNDERTAKES NO OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.

NO PERSON HAS BEEN AUTHORIZED BY NFC IN CONNECTION WITH THE PREPACKAGED PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY NFC. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OTHER THAN THOSE TO WHICH IT RELATES, OR AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES IN ANY JURISDICTION IN WHICH, OR TO ANY PERSON TO WHOM, IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE EXPRESSLY SET FORTH HEREIN, AND NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR THE DISTRIBUTION OF ANY SECURITIES PURSUANT TO THE PREPACKAGED PLAN WILL CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF. ANY ESTIMATES OF CLAIMS OR EQUITY INTERESTS SET FORTH IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE AMOUNTS OF CLAIMS OR EQUITY INTERESTS ULTIMATELY ALLOWED BY THE BANKRUPTCY COURT.

THE SUMMARIES OF THE PREPACKAGED PLAN AND OTHER DOCUMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR

ENTIRETY BY REFERENCE TO THE PREPACKAGED PLAN ITSELF, THE EXHIBITS ATTACHED THERETO AND ALL DOCUMENTS DESCRIBED THEREIN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE SUMMARIES PROVIDED HEREIN AND THE TERMS OF THE PREPACKAGED PLAN OR SUCH RELATED DOCUMENTS, THE TERMS OF THE PREPACKAGED PLAN SHALL GOVERN. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING, BUT NOT LIMITED TO, THE INFORMATION REGARDING THE HISTORY, BUSINESS, AND OPERATIONS OF NFC, THE HISTORICAL AND PROJECTED FINANCIAL INFORMATION OF NFC AND THE LIQUIDATION ANALYSIS RELATING TO NFC IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PREPACKAGED PLAN. AS TO ANY JUDICIAL PROCEEDINGS IN ANY COURT, INCLUDING ANY ADVERSARY PROCEEDINGS OR CONTESTED MATTERS THAT MAY BE FILED IN THE BANKRUPTCY COURT, SUCH INFORMATION IS NOT TO BE CONSTRUED AS AN ADMISSION OR STIPULATION BUT RATHER AS STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS AND SHALL BE INADMISSIBLE FOR ANY PURPOSE ABSENT THE EXPRESS WRITTEN CONSENT OF NFC.

EACH HOLDER OF CLAIMS IS ENCOURAGED TO CONSULT WITH ITS OWN LEGAL, REGULATORY, TAX, BUSINESS, FINANCIAL AND ACCOUNTING ADVISERS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THE PREPACKAGED PLAN TO THE EXTENT IT DEEMS NECESSARY TO MAKE AN INFORMED DECISION IN CONNECTION WITH ITS VOTE TO ACCEPT OR REJECT THE PREPACKAGED PLAN. HOLDERS OF CLAIMS MAY NOT RELY UPON ANY RECOMMENDATION, PROMISE, REPRESENTATION OR WARRANTY OF OR VIEW EXPRESSED BY OR ON BEHALF OF ANY PARTY, OTHER THAN THOSE EXPRESSED IN THE PREPACKAGED PLAN.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.

ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

**INTERNAL REVENUE SERVICE CIRCULAR 230 NOTICE:** TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY NFC OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

RLF1 3582605v. 5

## PREAMBLE

Over the past two years, the American banking and financial system has been shaken and many banks across the country have struggled to survive in the face of a declining economy. A number of these banks are confronting enormous pressure due to reduced capital, the imposition of regulatory sanctions and orders, and possible defaults under existing credit agreements. If these pressures are not alleviated, receivership is a near certainty for many of these institutions. The NFC reorganization described in this Disclosure Statement is a product of this very difficult operating environment.

Effective March 20, 2009, Nexity Bank consented to the issuance of an Order to Cease and Desist (the "C&D Order") with the Federal Deposit Insurance Corporation (the "FDIC") and the Alabama State Banking Department (the "Banking Department"), pursuant to which, among other things, Nexity Bank is required to increase its Tier 1 Leverage Ratio[2] to not less than eight (8) percent and its Total Risk-Based Capital Ratio[3] to not less than twelve (12) percent by June 30, 2009.[4] As of May 31, 2010, over one year later, Nexity Bank's Tier 1 Leverage Ratio was only at 2.68 percent and its Total Risk-Based Capital Ratio was just 6.04 percent. The sharp decline in these ratios during this time period is due in large part to significant losses on loans that Nexity Bank has incurred as a result of the downturn in the American economy in general, and the real estate values that have secured Nexity Bank's loans in particular. If Nexity Bank's Tier 1 Leverage Ratio were to fall below two percent, the FDIC would be required within ninety (90) days to appoint a receiver or conservator for Nexity Bank, or take such other action as it deemed appropriate. In addition, pursuant to the C&D Order, Nexity Bank may not pay dividends to the Debtor, NFC. Since Nexity Bank constitutes substantially all of NFC's consolidated assets, the restrictions under the C&D Order mean that NFC's financial health is directly (and virtually solely) dependent upon the financial health of Nexity Bank.

In today's environment, financial institutions like NFC and Nexity Bank, both of which are operating under regulatory orders, must raise capital or face liquidation. During the past 18 months, NFC has, to no avail, pursued various capital raising alternatives. As a result of the significant losses and reductions of capital which NFC and Nexity Bank have experienced over the past two years, combined with the restrictions imposed upon NFC and Nexity Bank by their regulators under both the Federal Reserve Order and the C&D Order, NFC must look to the chapter 11 bankruptcy process to restructure its debt obligations and thereby facilitate the raising of needed capital for Nexity Bank's operations.

---

[2] As used in this Disclosure Statement, the term "Tier 1 Leverage Ratio" means the ratio of Tier 1 capital to average total assets, as calculated in accordance with the appropriate banking agency's capital regulations.

[3] As used in this Disclosure Statement, the term "Total Risk-Based Capital Ratio" means the ratio of qualifying total capital to risk-weighted assets, as calculated in accordance with the appropriate banking agency's capital regulations.

[4] Subsequently, effective June 9, 2009, NFC consented to the issuance of a Cease and Desist Order (the "Federal Reserve Order") by the Board of Governors of the Federal Reserve System (the "Federal Reserve Board") and the Banking Department which, among other things, prohibits NFC from making distributions of interest or principal on the TruPS without prior Federal Reserve Board approval.

1

This Disclosure Statement describes the Prepackaged Plan that NFC's creditors are being asked to approve before NFC formally commences the Chapter 11 Case. The goal of the Prepackaged Plan is to (i) satisfy in full the subordinated notes issued in connection with the issuance of trust preferred securities by trusts wholly owned by NFC with either a cash payment equal to a percentage of the liquidation amount of the TruPS claims or shares of NFC Common Stock; and (ii) satisfy in full the secured debt of NFC with either a cash payment or shares of NFC Common Stock at a negotiated, favorable, discount. In sum, NFC intends to restructure its obligations in order to secure its long term financial viability which, absent restructuring, is in peril. Separately, but subject to and conditioned upon approval and consummation of the Prepackaged Plan, NFC is in the process of raising a gross amount of at least $175 million in new capital through the sale of additional shares of NFC Common Stock. These additional funds will be used to make the distributions contemplated under the Prepackaged Plan, pay the costs and expenses associated with the Chapter 11 Case and the transactions related to the recapitalization, support the Debtor's ongoing working capital needs and contribute the urgently needed capital to NFC and Nexity Bank.

It is important at the outset to emphasize the limited dimensions of this process:

- Neither Nexity Bank nor its depositors will be affected in any way. Nexity Bank continues to operate and its customers' deposits remain insured up to the applicable limits by the FDIC. Banks themselves cannot file for reorganization, but bank holding companies – and NFC is a holding company, not a bank – can use the reorganization process under federal law.

- If NFC's creditors approve the Prepackaged Plan, the court-supervised reorganization should move forward very quickly. A prepackaged plan shortens and simplifies the bankruptcy process. It can be very efficient and effective.

- All of NFC's general unsecured creditors will be paid in full.

Exceptional times call for exceptional and innovative solutions to preserve value. That is why this Disclosure Statement and the accompanying Prepackaged Plan are important to NFC's creditors and stakeholders and to the banking industry generally. The Debtor, like many others in the banking arena, raised capital in part through the issuance of trust preferred securities, which, under the capital adequacy regulations of the Federal Reserve Board, qualified as Tier 1 capital for NFC. This popular capital instrument has resulted in an estimated 646 banking companies with $131 billion of trust preferred securities outstanding.[5] Due to operating losses and regulatory constraints, NFC submits its Prepackaged Plan and Disclosure Statement as an effective method to resolve the TruPS, which is treated as equity by the regulatory authorities, and NFC's secured debt at a discount off face value, restore NFC's capital ratios and ensure that Nexity Bank is adequately capitalized, all to the ultimate benefit of NFC's creditors and stakeholders.

---

[5] American Banker, *CIB Marine Plan a Test Case for Trust-Preferred Default,* March 16, 2009.

RLF1 3582605v. 5

## ARTICLE I
## INTRODUCTION[6]

The Debtor is sending you this Disclosure Statement[7] because the Debtor is asking you to vote on approval of the Prepackaged Plan. A copy of the Prepackaged Plan is attached hereto as Exhibit A.[8] This Disclosure Statement describes certain aspects of the Prepackaged Plan, including the treatment of holders of Claims and Equity Interests, and also describes certain aspects of the Debtor's operations, financial projections, and other related matters.

The Debtor is making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof, unless otherwise specified. Each holder of a Claim or Equity Interest reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since the date set forth on the cover page of this Disclosure Statement. Holders of TruPS Claims and the Secured Lender Claim entitled to vote to accept the Prepackaged Plan must rely on their own evaluation of the Debtor and their own analysis of the terms of the Prepackaged Plan, including, but not limited to, any risk factors cited herein, in deciding whether to vote to accept or reject the Prepackaged Plan.

The contents of this Disclosure Statement may not be deemed to provide any legal, financial, securities, tax, or business advice. The Debtor urges each holder of a Claim or Equity Interest to consult with its own advisors with respect to any such legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Prepackaged Plan, and each of the proposed transactions contemplated thereby. Furthermore, the Bankruptcy Court's eventual approval of the adequacy of disclosure contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the merits of the Prepackaged Plan.

Moreover, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver. Rather, holders of Claims and Equity Interests should construe this Disclosure Statement as a statement made in settlement negotiations related to contested matters, adversary proceedings and other pending or threatened litigation or actions.

Holders of Claims and Equity Interests are encouraged to read and carefully consider this entire Disclosure Statement, including the Prepackaged Plan and the matters described under Article V.C of this Disclosure Statement entitled "Plan-Related Risk Factors to be Considered" and Article V.E of this Disclosure Statement entitled "Factors Affecting the Debtor" prior to deciding whether to accept or reject the Prepackaged Plan.

---

[6] This introduction is qualified in its entirety by the more detailed information contained in the Prepackaged Plan and elsewhere in the Disclosure Statement.

[7] Unless otherwise defined in this Disclosure Statement, all capitalized terms used, but not otherwise defined, in this Disclosure Statement shall have the meanings ascribed to them in the Prepackaged Plan.

[8] As set forth in this Disclosure Statement, all holders of TruPS Claims and the Secured Lender Claim who are entitled to vote on the Prepackaged Plan will receive this Disclosure Statement. Upon the filing of the Chapter 11 Case, all other holders of Claims and Equity Interests will receive a notice of the Disclosure Statement, which will provide details on how to obtain copies of this Disclosure Statement.

The Debtor has not authorized any party to give any information about or concerning the Prepackaged Plan other than the information contained in this Disclosure Statement. The Debtor has not authorized any representations concerning the Debtor or the value of its property other than as set forth in this Disclosure Statement. Claimants should not rely upon any information, representations, or other inducements made to obtain acceptance of the Prepackaged Plan that are other than, or inconsistent with, the information contained herein and in the Prepackaged Plan.

The Debtor's management has reviewed the financial information provided in this Disclosure Statement. Although the Debtor has used its best efforts to ensure the accuracy of this financial information, the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been audited.

The Debtor recommends that potential recipients of NFC Common Stock consult their own counsel concerning the securities laws considerations relating to consequences surrounding the transferability of the NFC Common Stock.

**This Disclosure Statement summarizes certain provisions of the Prepackaged Plan, certain other documents, and certain financial information. The Debtor believes that these summaries are fair and accurate; however, you should read the Prepackaged Plan in its entirety. In the event of any inconsistency or discrepancy between a description contained in this Disclosure Statement and the terms and provisions of the Prepackaged Plan or the other documents or financial information to be incorporated herein by reference, the Prepackaged Plan, or such other documents, as applicable, shall govern for all purposes.**

The Debtor is providing the information in this Disclosure Statement solely for purposes of soliciting the votes of holders of TruPS Claims and the Secured Lender Claim entitled to vote to accept or reject the Prepackaged Plan or object to the confirmation thereof. Nothing in this Disclosure Statement may be used by any Person for any other purpose.

All exhibits to this Disclosure Statement are incorporated into and made a part of this Disclosure Statement as if set forth in full herein.

## A.     Purpose and Effect of the Plan

The primary purpose of the Prepackaged Plan is to effectuate the restructuring and substantial deleveraging of the Debtor's capital structure by adding additional equity capital to fill in losses in order to make it more consistent with the Debtor's present and future prospects and to enhance the Debtor's regulatory capital position. The Prepackaged Plan will allow the Debtor to continue its business in the ordinary course and provides for full payment of Allowed Priority Non-Tax Claims, Allowed Other Secured Claims and Allowed General Unsecured Claims. Based on the current outlook, the funds expected to be generated by the Debtor's operations will not be sufficient to satisfy the Debtor's debt obligations and meet requisite capital ratios for Nexity Bank without this restructuring. The Debtor believes that the restructuring will reduce uncertainty with respect to its future and position it to better meet the banking needs of the communities it serves.

The Debtor developed the Prepackaged Plan only after exerting significant effort to effectuate a restructuring of its finances outside of a court-supervised process. Those efforts,

4

however, proved unsuccessful thereby necessitating the Prepackaged Plan. The Debtor believes that a seizure of Nexity Bank and the appointment of the FDIC as Nexity Bank's receiver is likely in the event that the Debtor is unable to restructure its debt and raise new capital through the NFC Stock Offering and is thereby forced into liquidation. If Nexity Bank, which constitutes the overwhelming majority of the Debtor's assets, were to be seized, material value would be lost for all of the Debtor's creditors and all such creditors would receive a lesser distribution on account of their claims, if any at all, than that proposed in the Prepackaged Plan. Consequently, the Debtor believes that the Prepackaged Plan is in the best interests of all of the Debtor's creditors.

In that regard, in connection with developing the Prepackaged Plan, the Debtor reviewed its current business operations and compared its prospects as an ongoing business enterprise with the estimated recoveries of Claims and Equity Interests in various liquidation scenarios. As a result, the Debtor concluded that the recovery for holders of Allowed Claims and Equity Interests would be maximized under the Prepackaged Plan. The Debtor believes that its business and assets have significant value that would not be realized in liquidation (in particular given the likelihood that Nexity Bank would be placed into receivership in the event this restructuring is not consummated). Consistent with the Liquidation Analysis attached hereto as Exhibit B, the value of the Debtor's assets is considerably greater if the Debtor is able to consummate the Prepackaged Plan and thereby can continue to operate as a going concern as compared to liquidating under chapter 7 of the Bankruptcy Code. Moreover, the Debtor believes that any alternative to confirmation of the Prepackaged Plan, such as commencement of a non-prepackaged chapter 11 case, liquidation, or attempts by another party in interest to file a plan of reorganization, would result in significant delays, litigation, and additional costs, and ultimately would lower the recoveries for holders of Allowed Claims and Equity Interests. Accordingly, the Debtor strongly recommends that you vote to accept the Prepackaged Plan, if you are entitled to vote thereon.

## B.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy commencement date (the "Petition Date"). The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. The Bankruptcy Court's confirmation of a plan binds the debtor, any Person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other Person or entity as may be ordered by the Bankruptcy Court, in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan provides for the treatment of the debtor's debt in accordance with the terms of the confirmed plan.

A "prepackaged" plan of reorganization is one in which a debtor seeks approval of a plan of reorganization from affected creditors *before* filing for bankruptcy. Because Solicitation of

acceptances takes place before the bankruptcy filing, the amount of time required for the bankruptcy case is often less than in more conventional bankruptcy cases. Greater certainty of results and reduced costs are other benefits generally associated with prepackaged bankruptcy cases.

### C. Summary of Classification and Treatment of Allowed Claims and Interests Under the Plan

The following chart summarizes distributions to holders of Allowed Claims and Equity Interests under the Prepackaged Plan.[9] The recoveries set forth below are projected recoveries and may change based upon changes in Allowed Claims and proceeds available.

| Class | Designation | Impairment | Estimated Recovery of Allowed Claims and Equity Interests |
|-------|-------------|------------|------------------------------------------------------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired | 100% |
| Class 2 | Secured Lender Claim | Impaired | 26.3% |
| Class 3 | Other Secured Claims | Unimpaired | 100% |
| Class 4 | General Unsecured Claims | Unimpaired | 100% |
| Class 5 | TruPS Claims | Impaired | 15%[10]/0%[11] |
| Class 6 | NFC Common Equity Interests | Impaired | Interests Pass Through Subject to Dilution |

---

[9] This chart is only a summary of the classification and treatment of Allowed Claims and Equity Interests under the Prepackaged Plan. Reference should be made to the entire Disclosure Statement and the Prepackaged Plan for a complete description of the classification and treatment of Allowed Claims and Equity Interests.

[10] The estimated recovery for Class 5 - TruPS Claims of 15% is calculated solely based upon the liquidation amount of the TruPS. Factoring in accrued interest of approximately $1,181,608 owed to the TruPS holders as of May 31, 2010, the estimated recovery for Class 5 - TruPS Claims would be approximately 14.2%.

[11] In the event that Class 5 - TruPS Claims does not vote to accept the Prepackaged Plan, the TruPS Holder Stock Election shall not be available to holders of TruPS Claims and all TruPS Claims shall be cancelled and discharged without any distribution.

RLF1 3582605v. 5

| Class | Designation | Impairment | Estimated Recovery of Allowed Claims and Equity Interests |
|---|---|---|---|
| Class 7 | Section 510(b) Claims | Impaired | 0% |

With minor exceptions, the Class 2 Secured Lender Claim is secured by first priority liens on substantially all of the property of the Debtor. After setting aside the value of the collateral of the Secured Lender, there is not enough enterprise value remaining to provide a full recovery to the Secured Lender. In the absence of a consensual restructuring and except as otherwise described in this Disclosure Statement, the absolute priority rule in section 1129(b) of the Bankruptcy Code may preclude the distribution of any value to holders of Claims in Class 4 and would preclude the distribution of any value to holders of Claims and Equity Interests in Classes 5[12] and 6. Specifically, as set forth in the Liquidation Analysis attached hereto as Exhibit B, absent a consensual restructuring, there would only be approximately $1.95 million in value to distribute among the Debtor's creditor constituencies, compared to the approximately $14.6 million Secured Lender Claim. Under this recovery scenario, the Secured Lender would be left with a significant deficiency claim and any recovery by holders of Claims and Equity Interests in Classes 5 and 6 would be precluded.

The Debtor and the Secured Lender have engaged in discussions concerning a consensual restructuring of the Debtor's liabilities and the advantages of facilitating a rapid conclusion to this Chapter 11 Case. Based on those discussions, and notwithstanding the deficiencies specified above, the Secured Lender has agreed to provide a portion of the value to which it would otherwise be entitled to holders of Claims and/or Equity Interests in Classes 4, 5 and 6. The treatment of Classes 4, 5 and 6 under the Prepackaged Plan reflects a compromise among the Debtor and the Secured Lender and is not an admission by the Secured Lender that such Classes would otherwise be entitled to any recovery.

**D.      Parties Entitled to Vote on the Plan**

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan. For example, holders of Claims and Equity Interests not impaired by the Prepackaged Plan are deemed to accept the Prepackaged Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the Prepackaged Plan. Holders of Claims or Equity Interests impaired by the Prepackaged Plan and receiving no distribution under the Prepackaged Plan are not entitled to vote because they are deemed to have rejected the Prepackaged Plan under section 1126(g) of the Bankruptcy Code.

The following sets forth the Classes that are entitled to vote on the Prepackaged Plan and the Classes that are not entitled to vote on the Prepackaged Plan:

---

[12] In addition, the NCT II Indenture and the NCT III Indenture explicitly subordinate in right of payment all TruPS Claims to the prior payment in full of all "Senior Indebtedness" of the Debtor, which includes "the principal, premium, if any, and interest in respect of (A) indebtedness of the Company for money borrowed...."

| Class | Designation | Entitled to Vote |
|-------|-------------|------------------|
| 1 | Priority Non-Tax Claims | No (deemed to accept) |
| 2 | Secured Lender Claim | Yes |
| 3 | Other Secured Claims | No (deemed to accept) |
| 4 | General Unsecured Claims | No (deemed to accept) |
| 5 | TruPS Claims | Yes |
| 6 | NFC Common Equity Interests | No (deemed to reject) |
| 7 | Section 510(b) Claims | No (deemed to reject) |

For a detailed description of the Classes of Claims and Equity Interests, as well as their respective treatment under the Prepackaged Plan, see Article III of the Prepackaged Plan.

E.    **Summary of Solicitation Package and Voting Instructions**

The following materials constitute the solicitation package (the "Solicitation Package"):

- the appropriate ballot (a "Ballot") and applicable Voting Instructions;

- a pre-addressed, postage pre-paid return envelope; and

- this Disclosure Statement with all exhibits (other than those exhibits to be included in the Prepackaged Plan Supplement), including the Prepackaged Plan.

The claimants in the voting classes, Class 2 and Class 5, entitled to vote to accept or reject the Prepackaged Plan shall be served by email or with paper copies of this Disclosure Statement with all exhibits, including the Prepackaged Plan. Any party who desires additional paper copies of these documents may request copies from the Debtor's counsel by writing to Mark D. Collins, Esq., Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801, or calling 302-651-7700. All parties entitled to vote to accept or reject the Prepackaged Plan shall receive by email, or a paper copy of, each appropriate Ballot.

Only the holders of Class 2 and Class 5 Claims are entitled to vote to accept or reject the Prepackaged Plan. To be counted, Ballots cast by holders must be received by the Debtor's counsel, at the address provided on the Ballot, by 5:00 p.m. (Eastern Daylight Time) on July 21, 2010, the Voting Deadline. Voting instructions are attached to each ballot. Please see Article VII.E, entitled "The Solicitation; Voting Procedures" for additional information.

Unless the Debtor, in its discretion, decides otherwise, any Ballot received after the Voting Deadline shall not be counted. Debtor's counsel will process and tabulate Ballots for each Class entitled to vote to accept or reject the Prepackaged Plan and will file a voting report (the "Voting Report") as soon as practicable on or after the Petition Date.

For answers to any questions regarding Solicitation procedures, parties may contact Debtor's counsel directly, at 302-651-7700, with any questions related to the Solicitation procedures applicable to their Claims and Equity Interests.

The Prepackaged Plan Supplement, if any, will be filed by the Debtor on or before the date that is five (5) days prior to the Confirmation Hearing. Details about how to access the Prepackaged Plan Supplement will be provided in the notice sent to all parties in interest on or after commencement of the Chapter 11 Case.

**Any Ballot that is properly executed by the holder of a Claim, but fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection of the Prepackaged Plan, shall not be counted.**

**Each holder of a Class 2 Secured Lender Claim or a Class 5 TruPS Claim must vote all of its Secured Lender Claim or TruPS Claims, as the case may be, either to accept or reject the Prepackaged Plan and may not split its votes. By signing and returning a Ballot, each Claim holder in Class 2 and Class 5 will certify to the Bankruptcy Court and the Debtor that no other Ballots with respect to such Secured Lender Claim or TruPS Claims have been cast or, if any other Ballots have been cast with respect to such Class of Secured Lender Claim or TruPS Claims, such other Ballots are revoked.**

**All Ballots are accompanied by Voting Instructions. It is important to follow the specific instructions provided with each Ballot.**

**The Debtor is relying on Section 4(2) of the Securities Act and similar Blue Sky Law provisions, as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code, to exempt from registration under the Securities Act and Blue Sky Law the offer or sale of securities in connection with the Solicitation and the Prepackaged Plan.**

F.     **The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Prepackaged Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Prepackaged Plan.

RLF1 3582605v. 5

Following commencement of the Chapter 11 Case, the Debtor intends to schedule promptly a Confirmation Hearing and will provide notice of the Confirmation Hearing to all necessary parties. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

## G. Confirming and Consummating the Plan

It is a condition to the consummation of the Prepackaged Plan that the Bankruptcy Court shall have entered the Confirmation Order and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto. Certain other conditions contained in the Prepackaged Plan must be satisfied or waived pursuant to the provisions of Article X of the Prepackaged Plan.

Following confirmation, the Prepackaged Plan will be consummated after all conditions specified in Article X of the Prepackaged Plan have been (a) satisfied or (b) waived pursuant to Article X of the Prepackaged Plan (the "Effective Date").

For further information, see Article X of the Prepackaged Plan, entitled "Conditions Precedent to Effective Date."

## H. Rules of Interpretation

The following rules for interpretation and construction shall apply to this Disclosure Statement: (1) capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meanings ascribed to such terms in Article I of the Prepackaged Plan; (2) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (3) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (4) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (5) any reference to a Person as a holder of a Claim or Equity Interest includes that Person's successors and assigns; (6) unless otherwise specified, all references in this Disclosure Statement to Articles are references to Articles of this Disclosure Statement or to this Disclosure Statement; (7) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits in this Disclosure Statement; (8) the words "herein," "hereof," and "hereto" refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Disclosure Statement; (10) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in this Disclosure Statement or the Prepackaged Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable;

10

(12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, unless otherwise stated; (13) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to this Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (14) unless otherwise specified, all references in this Disclosure Statement to monetary figures shall refer to currency of the United States of America.

The Debtor's legal advisor is Richards, Layton & Finger, P.A. ("RL&F"). RL&F can be contacted at:

Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn: Mark D. Collins, Esq.
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

**ARTICLE II**
**GENERAL INFORMATION**

## A. Description of Business

### 1. General Business

NFC was incorporated as a Delaware corporation on March 12, 1999, as GIBC, Inc. and subsequently changed its name to "Nexity Financial Corporation" on March 26, 1999.

NFC is the holding company for Nexity Bank (NFC and its non-Debtor subsidiaries are referenced herein as the "Company"). NFC is regulated by the Federal Reserve Board as a bank holding company under the Bank Holding Company Act of 1956 (as amended, the "BHC Act"). Nexity Bank is headquartered in Birmingham, Alabama with additional correspondent banking offices in Atlanta, Georgia; Myrtle Beach and Columbia, South Carolina; Dallas, Texas; Orlando, Florida; Milwaukee, Wisconsin; and Charlotte and Raleigh, North Carolina. NFC acquired all of the outstanding common stock of Peoples State Bank, Grant, Alabama, on November 1, 1999, and the name of Peoples State Bank was changed to "Nexity Bank" on January 5, 2000. The branch in Grant, Alabama continued to operate as a traditional bank under the name "Peoples State Bank" until December 31, 2000, when the assets and liabilities of the Grant Branch were sold.

The Company competes in two areas of the commercial banking industry: correspondent banking and Internet banking. The correspondent banking business includes providing bank and bank-related services to community banks. Correspondent banking services include loan participations, investment services, and clearing and cash management services. The Internet banking business includes providing consumer and small-business banking services via the Internet without a branch banking network.

11

## 2. Banking Operations

Nexity Bank is an Alabama state-chartered bank that is not a member of the Federal Reserve System. Its primary regulators are the FDIC and the Banking Department. Nexity Bank conducts deposit business in all 50 states in the United States and conducts loan business primarily in the southeastern United States and Texas.

On January 5, 2000, Nexity Bank received approval from the FDIC to initiate Internet banking operations and such operations began from the Company's office in Birmingham, Alabama on February 22, 2000.

## 3. Correspondent Banking

Nexity Bank provides correspondent banking services to community banks primarily in the southeastern United States and Texas. These services include loan participations, investment services, and clearing and cash management services.

Nexity Bank generates approximately 75% of its loan production through loan participations, bank stock loans, bank holding company loans, and other types of loans to banks. Loan participations are loans purchased from community banks because the community bank could not make the full amount of the loan on its own. The primary reasons that a community bank sells loan participations are because the loan exceeds such community bank's legal lending limit, it wishes to manage liquidity, or for other special needs. Nexity Bank's correspondent lenders focus primarily on small and medium-sized banks in Alabama, Florida, Georgia, North Carolina, South Carolina, and Texas.

The loans generated through community bank participations are typically real estate construction loans, commercial real estate loans, and loans secured by common stock of community banks. Construction and commercial real estate loans typically exceed the community bank's legal lending limit, and the size of the loan participation is usually between $1 million and $5 million. Nexity Bank underwrites each loan participation purchased using standard underwriting policies and procedures. These loans are geographically dispersed through the Company's market areas, resulting in no significant concentration in one small geographic region or state. Nexity Bank manages its risk by making loans on owner-occupied or income producing properties and by requiring collateral values that exceed the loan amount, adequate cash flow to service the debt, and in most cases, the personal guarantees of principals of the borrowers.

Nexity Bank provides investment services to community banks including fixed income securities sales, investment portfolio management services, including bond accounting and safekeeping, and asset/liability management services. Nexity Bank's investment sales team markets primarily U.S. Treasury and Agency securities, including mortgage-backed securities products and municipal securities. Investment representatives also provide portfolio management strategies to community banks. Nexity Bank also offers bond portfolio accounting and safekeeping services, as well as asset/liability management services. Nexity Bank's primary asset/liability management services are interest-rate risk modeling and consulting on strategies for effective balance sheet management.

12

Nexity Bank's clearing and cash management services allow community banks to outsource their daily funds management. Nexity Bank will automatically invest or borrow federal funds through an account that is linked to its accounts with the Federal Reserve Bank. Community banks can access their intra-day account information via the Internet. The online system allows them to perform wire transfers, ACH transactions, currency and coin orders, and other important banking operations. This system also allows access to critical loan participation accounting information and bond accounting and safekeeping reports.

### 4. Internet Banking

Nexity Bank also provides deposit products and services to consumers and small businesses via the Internet. The Internet provides an efficient distribution channel for serving deposit customers across the United States. Nexity Bank uses the Internet to provide advantages to customers desiring to purchase financial products with typically more attractive rates than are available through traditional banking channels, together with easy access to account and product information. Customers may access Nexity Bank on a 24/7 basis through any Internet service provider by means of an acceptable secure Web browser or by telephone or U.S. mail. Customers can access funds using ATM or debit cards. Customers may review account activity, enter transactions into an on-line account register, pay bills electronically and print bank statement reports, all on a real-time basis.

Nexity Bank also markets home equity loan products to consumers through the Internet. Home equity loan products account for approximately 5.6% of loans outstanding. Nexity Bank uses credit scoring systems in the underwriting process as well as external service providers for loan documentation and closing processes.

### 5. Nexity Investments, Inc.

During 2006, Nexity Bank established Nexity Investments, Inc. to provide investment portfolio management services.

### 6. Nexity Financial Services, Inc.

During 2002, Nexity Bank established Nexity Financial Services, Inc. ("NFS") to offer fixed annuity insurance products to consumers in the states of Alabama, Florida, Georgia, South Carolina, North Carolina, New York, Illinois, California and Tennessee. Nexity Financial Services of Florida, Inc. and Nexity Financial Services of New York, Inc. were also formed to offer these products. NFS began offering services to consumers in June 2003. After interest rates decreased during the latter part of 2003 and several insurance company providers reduced their efforts in the product, NFS staff were reassigned within the Company with one staff member maintaining the licenses and maintaining the minimal number of existing accounts.

In 2007, NFS was restructured from a subsidiary of Nexity Bank to a subsidiary of NFC. NFS received approval from the Financial Industry Regulatory Authority (FINRA) in September 2007 as a full service securities broker dealer. From its headquarters in Charlotte, North Carolina, NFS assists community banks in designing and operating Wealth Management services to meet the financial needs of individuals and businesses within their respective communities.

13

The Company is currently in the process of terminating the Wealth Management services business and will retain the broker dealer for potential future business use.

### 7. Competition

All aspects of the Company's business are highly competitive. Generally, the Company competes with other financial institutions including large banks in major financial centers and other financial intermediaries, such as savings and loan associations, credit unions, consumer finance companies, investment companies, mutual funds, other mortgage companies and financial services operations of major commercial and retail corporations. Competition among financial institutions is based on a variety of factors including interest rates offered on deposit accounts, interest rates charged on loans, credit and service charges, the quality of service rendered, and the convenience of service delivery. The Company competes in two areas of the commercial banking industry: correspondent banking and Internet banking.

#### a. Correspondent Banking

Bankers' banks have a special banking charter and compete with the Company on loan participations, investment services, and clearing and cash management services. They typically fund their balance sheet primarily with overnight federal funds purchased from community banks daily. Regional banks in the Company's geographical area also provide correspondent banking services, but these banks offer correspondent services that are typically ancillary to the traditional banking activities they conduct. The Company attempts to distinguish its services by concentrating its efforts on start-up banks and small to medium-sized community banks and compete in this market segment by offering responsive, high-quality service.

#### b. Internet Banking

There are two primary groups that provide competition for Internet banking services: financial institutions that market products and services via the Internet and financial institutions that only offer products and services via the Internet to their existing customer base. Because Internet banking is a process that tends to draw deposits nationally based upon attractive deposit rates (as is the case with the Company), the Internet banking competitive landscape is fragmented, and the Company does not believe any one competitor or group of competitors has a dominant market share.

Financial institutions typically offer similar deposit products and services as those the Company provides utilizing the Internet. These services are primarily marketed through websites such as bankrate.com, as well as Countrywide Bank, Ally Bank and E*Trade Bank, are some of the institutions that compete with the Company on bankrate.com. Some financial institutions (including large money center banks) also market their products and services through this channel. These institutions are the Company's primary competition, given that the second group's strategy is more defensive in nature. The Company concentrates its Internet banking efforts on money market accounts, short-term certificates of deposit, and home equity lines of credit and competes in this market segment by offering responsive, high-quality service with user-friendly technology and competitive pricing.

14

Nexity Bank advertises nationally primarily online on bankrate.com, bankrate monitor and through online search key words. The Company's competitors include money center banks and other larger competitors which have greater resources. The Company believes that it has competed effectively in the Internet market even with its larger competitors. The Company's funding strategy has effectively provided adequate funding of its balance sheet growth to date. The attractive rates the Company offers with the Internet deposits are supported by a six-day a week customer service call center which assists new and existing customers with questions, concerns and inquiries. The Company believes the call center extended-hour support enhances customer loyalty in an online environment of not meeting face to face with the customer base.

The Company's business model allows it to offer products and services within both the correspondent and Internet banking areas in a branchless banking structure. The branchless banking structure reduces the Company's required investment in physical assets and employees. The competitors described above typically compete with the Company in either correspondent or Internet banking.

### 8. *Employees*

As of the Petition Date, the Debtor employed three full-time equivalent employees: (i) Greg L. Lee, Chairman of the Board of Directors and Chief Executive Officer; (ii) David E. Long, President; and (iii) John J. Moran, Executive Vice President and Chief Financial Officer. Except for John J. Moran, who is located in Nexity Bank's Myrtle Beach, S.C. office, all of the Debtor's employees are located at the Debtor's Birmingham, Alabama headquarters.

Additionally, as of June 30, 2010, Nexity Bank employed 103 full-time equivalent employees, 66 of which are located in Birmingham, Alabama.

The Company provides a variety of benefit programs including a retirement plan as well as health, life, disability, and other insurance. All such programs, however, are provided at the Nexity Bank level and do not represent obligations of the Debtor.

### 9. *Board of Directors as of Petition Date*

The Debtor's Certificate of Incorporation ("Certificate") and By-Laws provide that the Board of Directors shall consist of a maximum of twelve (12) persons. As of the Petition Date, the Debtor's Board consisted of nine (9) directors. The Certificate and By-Laws also provide that the terms of the Board of Directors be staggered so that approximately one-third of the directors are elected each year to three-year terms. The following sets forth certain information about each director:

### 10. *Term Expiring at the 2013 Annual Meeting*

**David E. Long**, 47, has served as President of NFC and Nexity Bank since March 1999. Mr. Long was first elected a director of the Company in March 1999.

**Denise N. Slupe**, 45, owns DNS Consulting, Birmingham, Alabama (which provides investment portfolio consulting services) and manages her personal investments. She served as Vice President of The Banker's Bank, Atlanta, Georgia, providing asset/liability management

and investment portfolio management services to correspondent banks from 1993 to 1999. Ms. Slupe was first elected a director of NFC in March 1999.

**Mark A. Stevens**, 58, has served as Founder, Chief Executive Officer and President of Atlantic Southern Financial Group, Inc. (which is a reporting company with the SEC) and its wholly owned subsidiary, Atlantic Southern Bank, Macon, Georgia since December 2001. He has over 34 years experience in commercial lending and community bank management. Mr. Stevens was first elected a director of NFC in May 2006.

## 11. *Term Expiring at the 2012 Annual Meeting*

**R. Bradford Burnette**, 70, retired, serving as the Chairman of the Board, President and Chief Executive Officer of PAB Bankshares, Inc., Valdosta, Georgia from 1982 to 2001. Mr. Burnette continues to serve as a director of PAB Bankshares, Inc. (which is a reporting company with the SEC) and has been affiliated with Park Avenue Bank since 1968. Mr. Burnette has over 40 years of experience in commercial bank management. He previously served as a director of the Federal Home Loan Bank of Atlanta, Georgia. Mr. Burnette was first elected a director of NFC in July 2002.

**Greg L. Lee**, 50, has served as Chairman of the Board and Chief Executive Officer of NFC and Nexity Bank since March 1999. Mr. Lee was first elected a director of NFC in March 1999.

**Tommy E. Looper**, 62 is a retired banker and a banking consultant based in Myrtle Beach, South Carolina. From 1970 to 1982, he served as a bank examiner and later as the Chief Assistant to the Commissioner of Banking of the South Carolina State Board of Financial Institutions. He served as Executive Vice President and Chief Financial Officer and as a director of The Anchor Bank and Anchor Financial Corporation from 1982 until its merger with Carolina First Bank and The South Financial Group in 2000. He remained with Carolina First Bank until his retirement in 2002. Mr. Looper was first elected as a director of NFC in 2005.

## 12. *Term Expiring at the 2011 Annual Meeting*

**Randy K. Dolyniuk**, 56, has served as Founder, Chairman and Chief Executive Officer of CoastalSouth Bancshares, Inc. and its wholly owned subsidiary, CoastalStates Bank, Hilton Head Island, South Carolina since September 2003. Mr. Dolyniuk was the Market President for the South Coast Region of Carolina First Bank, Greenville, South Carolina from 1991 to 2003. He has over 30 years experience in commercial lending and community bank management. Mr. Dolyniuk was first elected a director of NFC in March 1999.

**John J. Moran**, 48, has served as Executive Vice President and Chief Financial officer of NFC and Nexity Bank since October 1999. Mr. Moran was first elected a director of NFC in March 1999.

**William L. Thornton, III**, 51 is the Chief Executive Officer of Thornton Homes, Inc. and Thornton Construction Company, Inc., Birmingham, Alabama. He has been in the real estate development and home building business for 26 years.

16

## B. Capital Structure

### 1. Revolving Credit Agreement

As of June 30, 2010, the Debtor had outstanding a revolving credit facility with the Secured Lender pursuant to which the Debtor owes the Secured Lender $14.2 million in principal amount plus accrued interest of $350,802. The common stock of Nexity Bank held by the Debtor is pledged as collateral under this facility.

### 2. Trust Preferred Securities (TruPS)

In 2004 and 2008, the Debtor's wholly owned trusts, Nexity Capital Trust II and Nexity Capital Trust III (the "Trusts"), issued $12 million and $10 million, respectively, in Trust Preferred Securities (the "TruPS"). Under the documents establishing the Trusts, the Trusts issued the TruPS and with those proceeds each purchased a debenture from the Debtor. Payments by the Debtor on the debenture to each Trust in turn provide funds to the Trust to pay interest and principal on the TruPS. The Debtor is permitted to suspend payments on the debentures for up to five years, and, beginning with the payment dates of July 1, 2009 and July 23, 2009, it deferred three of its quarterly interest payments in 2009 to each Trust. As of May 31, 2010, the Debtor had outstanding in the aggregate $22 million of TruPS in principal amount plus accrued interest of approximately $1,181,608.

### 3. Equity Interests

Effective April 5, 2010, the authorized number of shares of the NFC Common Stock was increased from 50,000,000 shares to 200,000,000 shares as a result of a special meeting of the stockholders held on March 24, 2010, at which the stockholders of NFC approved an amendment to NFC's Certificate. Effective June 25, 2010, the authorized number of shares of NFC Common Stock was increased from 200,000,000 shares to 800,000,000 shares as a result of the annual meeting of stockholders held on June 23, 2010, at which the stockholders of NFC approved an amendment to NFC's Certificate. NFC's authorized capital stock at June 25, 2010 consisted of 800,000,000 shares of NFC Common Stock, $0.01 par value per share, of which 7,766,393 shares were outstanding, and 5,000,000 shares of preferred stock, par value $0.01 per share, none of which was issued and outstanding, and of that amount 15,000 shares of Series A Junior Participating Preferred Stock were reserved for issuance pursuant to a Preferred Rights Agreement described below.

NFC's preferred stock may be issued from time to time as a class without series, or if so determined by the Board of Directors, either in whole or in part in one or more series. The voting rights, and such designations, preferences and relative, participating, optional or other special rights, if any, and the qualifications, limitations or restrictions thereof, if any, including, but not limited to, the dividend rights, conversion rights, redemption rights and liquidation preferences, if any, of any wholly unissued series of preferred stock (or of the entire class of preferred stock if none of such shares has been issued), the number of shares constituting any such series and the terms and conditions of the issue thereof may be fixed by resolution of the board of directors. The Certificate provided that the preferred stock may have a preference over the NFC Common Stock with respect to the payment of dividends and the distribution of assets

in the event of the liquidation or winding-up and such other preferences as may be fixed by the Debtor's board of directors.

The Debtor has in effect a Preferred Stock Rights Agreement (the "Preferred Rights Agreement") with Registrar and Transfer Company and, in connection therewith, on February 4, 2009, declared a dividend distribution of one preferred stock purchase right (each a "Right") for each outstanding share of NFC Common Stock, par value $0.01 per share, of NFC. Each Right entitles the registered holder thereof to purchase from NFC a unit consisting of one one-thousandth of a share of a newly created series of the NFC's Series A Junior Participating Preferred Stock, par value $0.01 per share, at a purchase price of $37.50 per Unit, subject to adjustments for "triggering events" and the acquisition of certain minimum amounts of NFC Common Stock in "acquiring persons" as defined in the Preferred Rights Agreement.

The Preferred Rights Agreement provides that the Rights may be redeemed at a redemption price of $0.001 per Right in cash or NFC Common Stock. Based upon 7,766,394 shares of NFC Common Stock outstanding, the Debtor is in process of redeeming the Rights for an aggregate cash payment of $7,767.00. Pursuant to such redemption, the Prepackaged Plan and related NFC Stock Offering, the Preferred Rights Agreement will be terminated.

## C.   Supervision and Regulation

### 1.   General

Bank holding companies and banks are regulated extensively under both federal and state law. The bank regulatory framework is intended primarily for the protection of depositors, the deposit insurance system, and the banking system, and not for the protection of shareholders or any other group. In addition, certain present or potential activities of the Debtor and Nexity Bank are subject to various securities and insurance laws and are regulated by the SEC and the securities and insurance regulators of the states in which the Company operates. To the extent that the following information describes statutory and regulatory provisions, it is qualified in its entirety by express reference to each of the particular statutory and regulatory provisions. A change in applicable statutes, regulations or regulatory policy may have a material effect on the business of the Company.

### 2.   The Debtor

The Debtor is registered as a bank holding company with the Federal Reserve Board. The Debtor is subject to examination, regulation and supervision by the Federal Reserve Board under the BHC Act. Accordingly, the Debtor is required to file annual reports and such additional information as the Federal Reserve Board may require.

Federal and state laws regulate the Debtor's corporate governance, its investment authority, its manner of doing business, its employment practices, its consumer privacy policies and procedures, its relationship with Nexity Bank and its other affiliates, its ability to merge with, acquire, or be acquired by other entities, its requisite minimum capital and the forms of capital, its payment of dividends or other distributions, the types of businesses in which it can engage, and many other aspects of its business.

18

### 3. Nexity Bank

Nexity Bank, an Alabama state banking corporation, is subject to supervision and examination by the FDIC and the Banking Department. Nexity Bank is also subject to various requirements and restrictions under federal and state law, including requirements to maintain minimum amounts of capital and reserves against deposits, requirements under the Community Reinvestment Act, restrictions on the types and amounts of loans that may be made and the interest that may be charged thereon and limitations on the types of investments that may be made, activities that may be engaged in, and types of services that may be offered. The operations of Nexity Bank are also affected by various consumer laws and regulations, including those relating to equal credit opportunity, truth in savings disclosures, debt collection laws, privacy regulations, and regulation of consumer lending practices. In addition to the impact of direct regulation, commercial banks are affected significantly by the actions of the Federal Reserve Board as it attempts to control the money supply and credit availability in order to achieve price stability while maintaining economic growth.

Strict compliance at all times with state and federal banking laws, as well as other laws, is and will continue to be required. The Debtor believes that the experience of Nexity Bank's executive management will assist it in its continuing efforts to achieve the requisite level of compliance. Certain provisions of state law may be preempted by existing and future federal laws, rules and regulations and no prediction can be made as to the impact of preemption on state law or the regulation of Nexity Bank thereunder.

### D. Events Leading to Chapter 11 Filing

### 1. Regulatory Orders

Nexity Bank entered into the C&D Order[13] with the FDIC and the Banking Department effective March 20, 2009, requiring that Nexity Bank and its affiliates, successors and assigns cease and desist from certain unsafe and unsound banking practices, as described below. Among other things, the C&D Order requires Nexity Bank to:

- Have and retain qualified management of Nexity Bank and assess management and staffing needs, qualifications and performance;

- Assure the on-going participation by Nexity Bank's Board of Directors in the affairs of Nexity Bank;

- Present a written capital plan to the FDIC and the Banking Department by April 30, 2009 by which Nexity Bank would achieve a Tier 1 Leverage Ratio of not less than 8 percent and a Total Risk-Based Capital Ratio of not less than 12 percent by June 30, 2009;

- Eliminate from Nexity Bank's books by charge-off or collection all assets classified Loss and within thirty (30) days of receipt of any future report of

---

[13] A copy of the C&D Order is available publicly at the FDIC's website at www.fdic.gov.

examination eliminate the remaining balance of any assets classified by Nexity Bank as "Loss" and 50 percent of assets classified by Nexity Bank as "Doubtful";

- Formulate and implement a plan to reduce Nexity Bank's risk exposure in classified assets and to reduce assets classified "substandard" in relation to Tier 1 Capital plus the allowance for loan losses to not more than 110 percent within 180 days, to not more than 75 percent within 360 days, to not more than 50 percent within 540 days and to continue to reduce the volume of such assets after that date;

- Cease to extend additional credit to any borrower who has a loan or extension of credit with Nexity Bank that is classified by Nexity Bank as "Loss" or "Doubtful" and not make further extensions of credit to any borrower whose loans are classified by Nexity Bank as "Substandard" unless Nexity Bank's board or appropriate committee determines that not doing so would be detrimental to Nexity Bank;

- Revise and adopt a lending policy to address all items of criticism and Nexity Bank's procedures for making and monitoring loans and develop a program of independent loan review to provide for identification and review of problem credits;

- Analyze and reduce credit concentrations;

- Revise Nexity Bank's policy for determining the allowance for loan losses and provide for a review by Nexity Bank's Board of Directors of the adequacy of such allowance at least once each calendar quarter;

- Develop and implement a written plan to improve Nexity Bank's earnings;

- Adopt and implement a plan regarding Nexity Bank's liquidity, including a weekly review of liquidity;

- Not pay cash dividends without the prior written consent of the FDIC and the Banking Department;

- Not increase the amount of brokered deposits above the amount outstanding at the date of the C&D Order and adopt and implement a written plan for reducing Nexity Bank's reliance on brokered deposits;

- Correct violations of law previously identified; and

- Develop and implement a strategic plan to improve Nexity Bank's performance, appoint a committee of the Board of Directors that is responsible for ensuring compliance with the C&D Order and provide progress reports to the FDIC and the Banking Department on Nexity Bank's compliance with the C&D Order.

20

Effective June 9, 2009, the Debtor consented to the issuance of the Federal Reserve Order[14] by the Federal Reserve Board and the Banking Department. The Federal Reserve Order generally provides for the development and implementation of actions to ensure that the Debtor's wholly owned subsidiary, Nexity Bank, complies with the C&D Order entered into with the FDIC and the Banking Department effective March 20, 2009, and any other supervisory action taken by Nexity Bank's federal or state regulators. Among other things, the Federal Reserve Order requires the Debtor to:

- Present a written capital plan to the Federal Reserve Board and the Banking Department within 30 days of the Federal Reserve Order by which the Debtor and Nexity Bank would achieve sufficient capital to meet current and future capital requirements, including compliance with the Capital Adequacy Guidelines for Bank Holding Companies and the applicable adequacy guidelines for Nexity Bank issued by the FDIC;

- The Debtor shall not declare or pay dividends without the prior written approval of the Federal Reserve Board and the Banking Department, nor shall it directly or indirectly take dividends or any other form of payment representing a reduction in capital from Nexity Bank without the prior written approval of the Federal Reserve Board and the Banking Department;

- The Debtor shall not make any distributions of interest, principal or other sums on subordinated debentures or trust preferred securities without the prior written approval of the Federal Reserve Board and the Banking Department;

- The Debtor shall not, directly or indirectly, incur, increase or guarantee any debt, nor purchase or redeem any shares of its stock, without the prior written approval of the Federal Reserve Board and the Banking Department;

- The Debtor will comply with applicable notice provisions in connection with the appointment of any new director or senior executive officer or a change in the responsibilities of any senior executive officer so that the officer would assume a different executive officer position. The Debtor will also comply with applicable restrictions on indemnifications and severance payments; and

- Within 30 days after the end of each quarter following the date of the Federal Reserve Order, the Debtor's Board of Directors shall submit to the Federal Reserve Board and the Banking Department written progress reports detailing the form and manner of all actions taken to secure the Debtor's compliance with the provisions of the Federal Reserve Order and the results thereof.

As the foregoing orders demonstrate, it is imperative that the Debtor raise additional capital. As of March 31, 2010, Nexity Bank's Tier 1 Leverage Ratio was 2.49%, its Tier 1 Risk-

---

[14] A copy of the Federal Reserve Order is available publicly at the Federal Reserve Board website at www.federalreserve.gov.

Based Capital Ratio[15] was 4.25% and its Total Risk-Based Capital Ratio was 5.75%. These levels are significantly below the minimum levels required by the C&D Order with the FDIC and the Banking Department.

Under the FDIC's capital standards, a bank is "significantly undercapitalized" if the bank has a Total Risk-Based Capital Ratio of less than 6.0 percent or a Tier 1 Leverage Ratio that is less than 3.0 percent or a Tier 1 Risk-Based Capital Ratio that is less than 3.0 percent. Under this definition, Nexity Bank's capital ratios place it in the significantly undercapitalized category.

Failure by Nexity Bank to comply with the C&D Order, or failure by the Debtor to comply with the Federal Reserve Order, may result in additional regulatory sanctions against Nexity Bank or the Debtor. These could include placing Nexity Bank into receivership.

The restriction on payments of dividends by Nexity Bank to the Debtor, due to continuing losses in Nexity Bank, general regulatory restrictions and the prohibitions set forth in the C&D Order, has placed significant pressure on the Debtor's ability to service its debt requirements on its secured debt and the TruPS. This debt service will be exceedingly difficult for the Debtor in the short term, and nearly impossible in the long-term. The Debtor has defaulted on a number of covenants with the Secured Lender and has sought waivers for such default, and the Debtor has suspended payments of interest to its TruPS holders. Although the Debtor is permitted to suspend interest payments to its TruPS holders for up to 20 quarters, without incurring a default under the relevant TruPS documents, the Debtor does not expect to be able to resume interest payments to its TruPS holders, and eventually to repay the principal, under current conditions.

As of February 9, 2009, the Debtor voluntarily delisted and deregistered, and ceased to file reports and other information with the SEC. More complete information on the Debtor and Nexity Bank can be found at: www.fdic.gov.

### 2. *Payment of Dividends*

The Debtor is a legal entity separate and distinct from its banking subsidiary. The principal source of cash flow of the Debtor, including cash flow to pay dividends on its stock, is dividends from Nexity Bank. There are statutory, regulatory and prudential limitations on the payment of dividends by Nexity Bank to the Debtor, as well as by the Debtor to its shareholders.

Nexity Bank is restricted in its ability to pay dividends under state law and by the C&D Order.

The payment of cash dividends by Nexity Bank may also be affected or limited by other factors, such as the requirements to maintain adequate capital above regulatory guidelines. In addition, if, in the opinion of the applicable regulatory authority, a bank under its jurisdiction is engaged in or is about to engage in an unsafe or unsound practice (which, depending on the financial condition of the bank, could include the payment of cash dividends), such authority

---

[15] As used in this Disclosure Statement, the term "Tier 1 Risk-Based Capital Ratio" means the ratio of qualifying total capital to risk-weighted assets, as calculated in accordance with the appropriate banking agency's capital regulations.

may require, after notice and hearing, that such bank cease and desist from such practice. Paying dividends that deplete a bank's capital base to an inadequate level may constitute an unsafe and unsound banking practice.

Under the Federal Deposit Insurance Act (the "FDIA"), an FDIC-insured depository institution may not make any capital distributions (including the payment of dividends) or pay any management fees to its holding company or pay any dividend if it is undercapitalized or if such payment would cause it to become undercapitalized.

There can be no assurance when, or whether, the Debtor will be in a position to pay cash dividends on NFC Common Stock.

### 3. Restrictions on Acquisitions and Certain Activities

As a bank holding company subject to the BHC Act, the Debtor must obtain prior Federal Reserve Board approval for bank acquisitions and is generally limited to engaging in banking or bank-related activities. The Debtor must obtain prior approval of the Federal Reserve Board before (1) acquiring, directly or indirectly (except in certain limited circumstances), ownership or control of more than 5% of the voting stock of a bank, (2) acquiring all or substantially all of the assets of a bank, or (3) merging or consolidating with another bank holding company. The BHC Act also generally limits the business in which a bank holding company may engage in banking, managing or controlling banks, and furnishing or performing services for the banks that it controls.

The Federal Reserve Board may require that a bank holding company terminate an activity or terminate control of or liquidate or divest certain subsidiaries or affiliates when the Federal Reserve Board believes the activity or the control of the subsidiary or affiliate constitutes a significant risk to the financial safety, soundness or stability of any of its banking subsidiaries. The Federal Reserve Board also has the authority to regulate provisions of certain bank holding company debt, including authority to impose interest ceilings and reserve requirements on such debt. Under certain circumstances, a bank holding company must file written notice and obtain approval from the Federal Reserve Board prior to purchasing or redeeming its equity securities.

Moreover, poor examination ratings, lower capital ratios than peer group institutions, regulatory concerns regarding management, controls, assets, operations, or other factors can all potentially result in practical limitations on the ability of a bank or bank holding company to engage in new activities, grow, acquire new businesses, repurchase its stock or pay dividends or continue to conduct existing activities.

### 4. Debtor Expected to be Source of Financial Strength for Bank Subsidiaries

Under Federal Reserve Board policy, the Debtor is expected to act as a source of financial strength to, and to commit resources to support, Nexity Bank. This support may be required at times when, absent such Federal Reserve Board policy, the Debtor may not be inclined to provide it. In addition, any capital loans by a bank holding company to Nexity Bank are subordinate in right of payment to deposits and to certain other indebtedness of such subsidiary bank. In the event of a bank holding company's bankruptcy, any commitment by the bank holding company to a federal bank regulatory agency to maintain the capital of a subsidiary

23

bank will be assumed by the bankruptcy trustee and entitled to a priority of payment. Moreover, as a shareholder of Nexity Bank, the Debtor would rank low in priority relative to other stakeholders of Nexity Bank in the event that Nexity Bank were liquidated. Depositors of a bank, and the FDIC as their subrogee, would likely be entitled to priority over creditors of Nexity Bank, including the Debtor, in the event of a liquidation of Nexity Bank.

### 5. Capital Adequacy

The Federal Reserve Board has adopted risk-based capital guidelines for bank holding companies such as the Debtor. The minimum guideline for the ratio of total capital ("Total Capital") to risk-weighted assets (including certain off-balance-sheet items, such as standby letters of credit) is 8%, and the minimum ratio of Tier 1 Capital (defined below) to risk-weighted assets is 4%. At least half of the Total Capital must be composed of common stock, minority interests in the equity accounts of consolidated subsidiaries, noncumulative perpetual preferred stock and a limited amount of cumulative perpetual preferred stock, less goodwill and certain other intangible assets ("Tier 1 Capital"). The remainder may consist of qualifying subordinated debt, certain types of mandatory convertible securities and perpetual debt, other preferred stock and a limited amount of loan loss reserves.

In addition, the Federal Reserve Board has established minimum Tier 1 Leverage Ratio guidelines for bank holding companies such as the Debtor. These guidelines provide for a minimum ratio of Tier 1 capital to quarterly average assets, less goodwill and certain other intangible assets, of 4% for bank holding companies that meet certain specific criteria, including having the highest regulatory rating. All other bank holding companies generally are required to maintain a Tier 1 Leverage Ratio of at least 4%, plus an additional cushion of 100 to 200 basis points. The guidelines also provide that bank holding companies experiencing internal growth or making acquisitions will be expected to maintain strong capital positions substantially above the minimum supervisory levels without significant reliance on intangible assets. Furthermore, the Federal Reserve Board has indicated that it will consider a tangible Tier 1 Leverage Ratio (deducting all intangibles) and other indicia of capital strength in evaluating proposals for expansion or new activities.

Nexity Bank is also subject to minimum risk-based and leverage capital requirements similar to those described above adopted by the Federal Reserve Board. Failure to meet capital guidelines (including the capital guidelines in the Consent Order which exceed minimum regulatory guidelines) could subject a bank to a variety of enforcement remedies, including the termination of deposit insurance by the FDIC, and to certain restrictions on its business and in certain circumstances to the appointment of a conservator or receiver.

### 6. Prompt Corrective Action and Other Consequences of Capital Adequacy

The FDIA, among other things, that the federal banking regulators take prompt corrective action with respect to FDIC-insured depository institutions that do not meet minimum capital requirements. Under the FDIA, insured depository institutions are divided into five capital tiers: well capitalized, adequately capitalized, undercapitalized, significantly undercapitalized and critically undercapitalized. Under applicable regulations, an institution is defined to be well capitalized if it has a Tier 1 Leverage Ratio of at least 5%, a Tier 1 Risk-Based Capital Ratio of

24

at least 6% and a Total Risk-Based Capital Ratio of at least 10%, and it is not subject to a directive, order or written agreement to meet and maintain specific capital levels (such as Nexity Bank's Consent Order). An institution is defined to be adequately capitalized if it has a Tier 1 Leverage Ratio of at least 4%, a Tier 1 Risk-Based Capital Ratio of at least 4% and a Total Risk-Based Capital Ratio of at least 8%, and it does not meet the definition of a well-capitalized bank. An institution will be considered undercapitalized if it has a Tier 1 Leverage Ratio less than 4% or a Tier 1 Risk-Based Capital Ratio of less than 4% or a Total Risk-Based Capital Ratio of less than 8%. An institution is defined to be significantly undercapitalized if it has a Total Risk-Based Capital Ratio of less than 6% or a Tier 1 Risk-Based Capital Ratio of less than 3% or a Tier 1 Leverage Ratio of less than 3%. Finally, an institution will be considered critically undercapitalized if it fails to maintain a level of tangible equity equal to at least 2% of total assets. An institution may be deemed to be in a capitalization category that is lower than is indicated by its actual capital position if it receives an unsatisfactory examination rating.

The FDIA generally prohibits an FDIC-insured depository institution from making any capital distribution (including payment of dividends) or paying any management fee to its holding company if the depository institution would thereafter be undercapitalized. Undercapitalized depository institutions are subject to restrictions on borrowing from the Federal Reserve System. In addition, undercapitalized depository institutions are subject to growth limitations and are required to submit capital restoration plans. An insured depository institution's holding company must guarantee the capital plan, up to an amount equal to the lesser of 5% of the depository institution's assets at the time it becomes undercapitalized or the amount of the capital deficiency when the institution fails to comply with the plan, for the plan to be accepted by the applicable federal regulatory authority. The federal banking agencies may not accept a capital plan without determining, among other things, that the plan is based on realistic assumptions and is likely to succeed in restoring the depository institution's capital. If a depository institution fails to submit an acceptable plan, it is treated as if it is significantly undercapitalized.

Significantly undercapitalized depository institutions may be subject to a number of requirements and restrictions, including orders to sell sufficient voting stock to become adequately capitalized, requirements to reduce total assets and cessation of receipt of deposits from correspondent banks. Critically undercapitalized depository institutions are subject to appointment of a receiver or conservator, generally within ninety (90) days of the date on which they become critically undercapitalized.

Business activities may be influenced by an institution's capital classification. For example, only a "well capitalized" depository institution may accept brokered deposits without prior regulatory approval and an "adequately capitalized" institution may accept such deposits only with prior regulatory approval.

### 7. *General Regulatory Considerations*

Under the Federal Deposit Insurance Corporation Improvement Act ("FDICIA"), all insured institutions must undergo regular on-site examination by their appropriate banking agency. The cost of examinations of insured depository institutions and any affiliates may be assessed by the appropriate agency against each institution or affiliate as it deems necessary or

25

appropriate. Insured institutions are required to submit annual reports to the FDIC and the appropriate agency (and state supervisor when applicable). FDICIA also directs the FDIC to develop with other appropriate agencies a method for insured depository institutions to provide supplemental disclosure of the estimated fair market value of assets and liabilities, to the extent feasible and practicable, in any balance sheet, financial statement, report of condition or any other report of any insured depository institution. FDICIA also requires the federal banking regulatory agencies to prescribe, by regulation, standards for all insured depository institutions and depository institution holding companies relating, among other things, to: (i) internal controls, information systems and audit systems; (ii) loan documentation; (iii) credit underwriting; (iv) interest rate risk exposure; and (v) asset quality.

In response to perceived needs in financial institution regulation, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act of 1989. That statute, called FIRREA, provides that a depository institution insured by the FDIC can be held liable for any loss incurred by, or reasonably expected to be incurred by, the FDIC in connection with (i) the default of a commonly controlled FDIC-insured depository institution or (ii) any assistance provided by the FDIC to a commonly controlled FDIC insured depository institution in danger of default.

FIRREA provides that certain types of persons affiliated with financial institutions can be fined by the federal regulatory agency having jurisdiction over a depository institution with federal deposit insurance (such as Nexity Bank) could be fined up to $1 million per day for each knowing or reckless violation of regulations which relate (primarily) to lending to, and transactions with, executive officers, directors, and principal shareholders, including the interests of these individuals, which violation causes substantial loss to the bank or monetary gain or other benefit to the offender.

Other violations may result in civil money penalties of $5,000 to $25,000 per day or in criminal fines and penalties. In addition, the FDIC has been granted enhanced authority to withdraw or to suspend deposit insurance in certain cases. The banking regulators have not been reluctant to use the new enforcement authorities provided under FIRREA. Further, regulators have broad power to issue cease and desist orders that may, among other things, require affirmative action to connect any harm resulting from a violation or practice, including restitution, reimbursement, indemnifications or guarantees against loss. A financial institution may also be ordered to restrict its growth, dispose of certain assets, rescind agreements or contracts or take other actions as determined by the ordering agency to be appropriate.

Nexity Bank is subject to certain restrictions on extensions of credit to executive officers, directors, certain principal stockholders and their related interests. Such extensions of credit (i) must be made on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with third parties and (ii) must not involve more than the normal risk of repayment or present other unfavorable features.

## 8.    The Community Reinvestment Act

The federal law known as the Community Reinvestment Act ("CRA") requires that each insured depository institution shall be evaluated by its primary federal regulator with respect to

26

its record in meeting the credit needs of its local community, including low and moderate income neighborhoods, consistent with the safe and, sound operation of those institutions. These factors are also considered in evaluating mergers, acquisitions and applications to open a branch or facility.

A bank's compliance with its CRA obligations is based on a performance-based evaluation system which bases CRA ratings on an institution's lending service and investment performance. When a bank holding company applies for approval to acquire a bank or other bank holding company, the Federal Reserve Board will review the assessment of each subsidiary bank of the applicant bank holding company, and such records may be the basis for denying the application. In connection with its assessment of CRA performance, the appropriate bank regulatory agency assigns a rating of "outstanding," "satisfactory," "needs to improve" or "substantial noncompliance." As of its most recent CRA examination, dated September 2, 2008, Nexity Bank was rated at least "satisfactory."

## 9. USA Patriot Act

After the terrorist attacks of September 11, 2001, Congress enacted broad anti-terrorism legislation called the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001," which is generally known as the "USA Patriot Act." Title III of the USA Patriot Act requires financial institutions, including the Debtor and Nexity Bank, to help prevent, detect and prosecute international money laundering and the financing of terrorism. The Department of the Treasury has adopted additional requirements to further implement Title III.

The law is intended to enhance the powers of the federal government and law enforcement organizations to combat terrorism, organized crime and money laundering. The USA Patriot Act materially amended and expanded the application of the existing Bank Secrecy Act. It provided enhanced measures regarding customer identity, new suspicious activity reporting rules and enhanced anti-money laundering programs. Under the Act, each financial institution is required to establish and maintain anti-money laundering compliance and due diligence programs, which include, at a minimum, the development of internal policies, procedures, and controls; the designation of a compliance officer; an ongoing employee training program; and an independent audit function to test programs. In addition, the USA Patriot Act requires the bank regulatory agencies to consider the record of a bank or bank holding company in combating money laundering activities in their evaluation of bank and bank holding company merger or acquisition transactions.

The Department of the Treasury has issued regulations under the USA Patriot Act. The regulations state that a depository institution will be deemed in compliance with the Act provided it continues to comply with the current Bank Secrecy Act regulations. Under these regulations, a mechanism has been established for law enforcement to communicate names of suspected terrorists and money launderers to financial institutions, in return for securing the ability to promptly locate accounts and transactions involving those suspects. Financial institutions receiving names of suspects must search their account and transaction records for potential matches and report positive results to the Treasurer's Financial Crimes Enforcement Network ("FinCEN"). Each financial institution must designate a point of contact to receive information

27

requests. These regulations outline how financial institutions can share information concerning suspected terrorist and money laundering activity with other financial institutions under protection from the statutory safe harbor from liability, provided each financial institution notifies FinCEN of its intent to share information.

The Department of the Treasury has also adopted regulations intended to prevent money laundering and terrorist financing through correspondent accounts maintained by U.S. financial institutions on behalf of foreign banks. Financial institutions are required to take reasonable steps to ensure that they are not providing banking services directly or indirectly to foreign shell banks.

### 10. Other Legislation and Regulation

Other legislative and regulatory proposals regarding changes in banking and the regulation of banks, thrifts and other financial institutions are considered from time to time by the executive branch of the federal government, Congress and various state governments. A major legislative initiative currently called the "Dodd-Frank Wall Street Reform and Consumer Protection Act" is currently being considered by Congress. If signed into law, this act is expected to affect banks and their holding companies in significant ways. It cannot be predicted whether any of such legislative or regulatory proposals will be adopted and, if adopted, how these will affect the Debtor or Nexity Bank.

### 11. Monetary and Fiscal Policy

Banking is a business which depends on interest rate differentials. In general, the difference between the interest paid by a bank on its deposits and its other borrowings and the interest received by a bank on its loans to customers and its securities holdings generally constitutes the major portion of a bank's earnings. Thus, the earnings and growth of Nexity Bank will be subject to the influence of economic conditions generally, both domestic and foreign, and also to the monetary and fiscal policies of the United States and its agencies, particularly the Federal Reserve Board. The Federal Reserve Board regulates the supply of money through various means, including open-market dealings in United States government securities, the discount rate at which members may borrow, and reserve requirements on deposits and funds availability regulations. These instruments are used in varying combinations to influence the overall growth of bank loans, investments and deposits and also affect interest rates charged on loans paid on deposits. The policies of the Federal Reserve Board have had a significant effect on the operating results of commercial banks in the past and will continue to do so in the future. The nature and timing of any future changes in Federal Reserve Board policies and their impact on Nexity Bank cannot be predicted.

## E. Anticipated Events During The Chapter 11 Case

### 1. Administration of the Prepackaged Plan

The Debtor intends to continue to operate its business in the ordinary course throughout its Chapter 11 Case as it had prior to the commencement date of the Chapter 11 Case. Given the prepackaged nature of the Chapter 11 Case, the Debtor does not anticipate that a statutory committee of creditors holding General Unsecured Claims or TruPS Claims will be appointed.

RLF1 3582605v. 5

## 2. Commencement of the Chapter 11 Case

On the Petition Date, the Debtor intends to request a series of orders from the Bankruptcy Court to minimize any disruption of its business operations and to facilitate its reorganization. These requests include, but are not limited to, those described below. There can be no assurance, however, that the Bankruptcy Court will grant the requested relief. Bankruptcy courts customarily provide various other forms of administrative and other relief in the early stages of chapter 11 cases. The Debtor intends to seek all necessary and appropriate relief from the Bankruptcy Court in order to facilitate its reorganization goals, including the matters described below. All votes to accept the Prepackaged Plan shall be deemed to constitute consents to relief to be sought by the Debtor upon the commencement of the Chapter 11 Case as identified below.

## 3. Schedules and Statement of Financial Affairs

Section 521 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 1007 direct that, unless otherwise ordered by the court, the Debtor must prepare and file schedules of claims, executory contracts and unexpired leases (the "Schedules") and related information and a statement of financial affairs (the "Statement"), within 15 days from the commencement of the Chapter 11 Case.[16] The purpose of this requirement is to provide the Debtor's creditors, equity security holders and other interested parties with sufficient information to make informed decisions with respect to the Debtor's reorganization. In appropriate circumstances, however, a Bankruptcy Court may modify or dispense with the requirement to file the Schedules and the Statement pursuant to section 521 of the Bankruptcy Code. The Debtor believes that such circumstances would exist in the Chapter 11 Case and that it should not be required to file the Schedules and the Statement. The Debtor thus intends to request that the Bankruptcy Court waive the necessity of filing the Schedules and the Statement or defer such filing pending confirmation of the Prepackaged Plan.

## 4. Approval of Prepetition Solicitation and Scheduling of Confirmation Hearing

The Debtor will seek an order of the Bankruptcy Court scheduling the Confirmation Hearing to consider (1) approval of the prepetition Solicitation procedures, (2) the adequacy of the Disclosure Statement and the Solicitation of votes in connection therewith and (3) confirmation of the Prepackaged Plan. The Debtor anticipates that notice of these hearings will be published in The Wall Street Journal (National edition) and will be mailed to all known holders of Claims and Equity Interests at least twenty-eight (28) days before the date by which objections must be filed with the Bankruptcy Court.

## 5. Cash Management System

Because the Debtor expects the entire Chapter 11 Case to last for less than three months, and because of the administrative hardship that any operating changes would impose on the

---

[16] Rule 1007-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware further provides that the deadline for filing the Schedules and Statement automatically is extended for an additional fifteen (15) days if a debtor has more than 200 creditors and if the petition is accompanied by a creditor list. The Debtor does not, however, have more than 200 creditors.

29

Debtor, the Debtor intends to seek Bankruptcy Court authority to continue using its existing cash management system, bank accounts and business forms. Absent the Bankruptcy Court's authorization of the continued use of the cash management system, the Debtor's cash flow could be severely impeded, to the detriment of the Estate and creditors.

### 6. Investment and Deposit Policies

Section 345 of the Bankruptcy Code establishes certain guidelines for the deposit and investment of funds of the Estate. Upon an appropriate showing, such guidelines may be waived by the Bankruptcy Court, and the Debtor may be authorized to continue to deposit and invest its funds pursuant to an existing investment policy. The Debtor believes that strict adherence to the requirements of section 345 of the Bankruptcy Code would cause significant disruption to its cash management system, to the detriment of the Debtor's business and creditors. The Debtor also believes that its existing investment policies provide for the secure and efficient investment and management of the Debtor's funds, and that the disruption that would result from compliance with section 345 of the Bankruptcy Code is not warranted, particularly in light of the anticipated short duration of the Chapter 11 Case. Accordingly, the Debtor intends to seek a waiver of the requirements of section 345 of the Bankruptcy Code so as to permit it to continue its existing deposit and investment policies.

### 7. Retention of Professionals

The Debtor intends to seek Bankruptcy Court authority to retain and employ certain professionals to represent it and assist it in connection with the Chapter 11 Case. Some of these professionals have been intimately involved with the negotiation and development of the Prepackaged Plan and include RL&F as counsel for the Debtor and FBR Capital Markets & Co. as exclusive financial restructuring advisor and exclusive initial purchaser and/or placement agent to the Debtor. The Debtor may also seek authority to retain certain professionals to assist with the operations of their businesses in the ordinary course. These so-called "ordinary course professionals" will not be involved in the administration of the Chapter 11 Case.

RL&F will also serve as the Solicitation agent in connection with the Solicitation of votes to accept or reject the Prepackaged Plan. The Debtor will pay the fees and expenses attributable to the Solicitation.

### 8. Anticipated Timetable for the Chapter 11 Case

In a "prepackaged" chapter 11 case such as the Chapter 11 Case, the creditors' votes are solicited before filing, and the plan confirmation process starts immediately upon filing the chapter 11 case. Because prepackaged chapter 11 cases usually have little or no effect on the debtor's business operations, prepackaged chapter 11 cases often take less time to complete than more conventional bankruptcy cases. Greater certainty of results and reduced costs are other benefits generally associated with prepackaged bankruptcy cases.

Assuming that the Bankruptcy Court approves the scheduling motion with respect to the Confirmation Hearing, the Debtor anticipates that the Confirmation Hearing will occur approximately thirty-five (35) days following the Petition Date. The Debtor does not currently anticipate any significant objections to confirmation of the Prepackaged Plan. If such objections

were to be raised, the anticipated timing for the Confirmation Hearing could be delayed, perhaps substantially.

The Debtor does not expect the Chapter 11 Case to be protracted, because so long as Class 2 (Secured Lender Claim) votes in favor of the Prepackaged Plan, the Debtor intends to start the process of confirming the Prepackaged Plan on the first day of the Chapter 11 Case by filing the Prepackaged Plan and this Disclosure Statement.

## ARTICLE III
## THE PREPACKAGED PLAN

### A. Classification and Treatment of Claims and Equity Interests Under the Prepackaged Plan

Section 1123 of the Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, a debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests that give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified. Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on a plan of reorganization and the right to receive thereunder no less value than the holder would receive if the debtor were liquidated in a case filed under chapter 7 of the Bankruptcy Code. A chapter 11 plan cannot be confirmed if there has been improper classification of claims and interests.

Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable and contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the Effective Date or the date on which amounts owing are actually due and payable, payment in full, in Cash, with postpetition interest to the extent appropriate and provided for under the governing agreement (or if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Under certain circumstances, a Class of claims or equity interests may be deemed to reject a plan of reorganization. For example, a Class is deemed to reject a plan of reorganization under section 1126(g) of the Bankruptcy Code if the holders of claims or interests in such Class do not receive or retain any property under the plan of reorganization on account of their claims

31

or equity interests. Under this provision of the Bankruptcy Code, certain Classes are deemed to reject the Prepackaged Plan because they receive no distribution under the Prepackaged Plan as such plan discharges the Debtor from obligations to these holders. Because certain Classes are deemed to reject the Prepackaged Plan, the Debtor is required to demonstrate that the Prepackaged Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to such Classes. Among these are the requirements that the plan be "fair and equitable" and not "discriminate unfairly" against the holders of claims or equity interests in such Class. For a more detailed description of the requirements for confirmation, see Article VI below, entitled "CONFIRMATION OF THE PREPACKAGED PLAN – Requirements for Confirmation of the Prepackaged Plan – Non-Consensual Confirmation."

The Debtor believes that the Prepackaged Plan classifies all Claims and Equity Interests in compliance with the provisions of the Bankruptcy Code. However, after commencement of the Chapter 11 Case, a Claim holder or Equity Interest holder could challenge the Debtor's classification and the Bankruptcy Court could determine that a different classification is required for the Prepackaged Plan to be confirmed. In such event, the Debtor may seek to modify the Prepackaged Plan to provide for whatever classification may be required by the Bankruptcy Court and to use the sufficient acceptances received, to the extent permitted by the Bankruptcy Court, to demonstrate the acceptance of the Class or Classes which are affected. Any such reclassification could affect a Class's acceptance of the Prepackaged Plan by changing the composition of such Class and the required vote for Acceptance of the Prepackaged Plan and could potentially require a resolicitation of votes on the Prepackaged Plan.

The Prepackaged Plan provides for the classification and treatment of holders of Claims and Equity Interests allowed under section 502 of the Bankruptcy Code. Only the holder of an Allowed Claim or an Allowed Equity Interest is entitled to receive a distribution under the Prepackaged Plan.

Consistent with these requirements, the Prepackaged Plan divides the Allowed Claims against, and Allowed Equity Interests in, the Debtor into the following classes:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Secured Lender Claim | Impaired | Yes |
| Class 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 4 | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 5 | TruPS Claims | Impaired | Yes |
| Class 6 | NFC Common Equity Interests | Impaired | No (deemed to reject) |

RLF1 3582605v. 5

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 7 | Section 510(b) Claims | Impaired | No (deemed to reject) |

## B.    Treatment of Unclassified Claims

### 1.    *Administrative Expense Claims*

Each holder of an Allowed Administrative Expense Claim shall receive payment in full in Cash of the unpaid portion of such Allowed Administrative Expense Claim (a) in the case of professional fees and expenses for other advisors, as soon as practicable after Bankruptcy Court approval thereof, or, in the case of professionals retained by the Debtor in the ordinary course of their business, if any, on such terms as are customary between the Debtor and such professionals, (b) with respect to all other holders of Allowed Administrative Expense Claims, on the later of (i) the Effective Date and (ii) the date on which such payment would be made in the ordinary course of the Debtor's business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements or regulations governing, instruments evidencing or other documents relating to such transactions or (c) with respect to any Claim described in clauses (a) and (b) hereof, as otherwise agreed by the holder of such Claim and the Debtor. Disputed but not yet Allowed Administrative Expense Claims shall receive payment on the later of (i) the date such Disputed Allowed Administrative Expense Claim becomes Allowed and (ii) the date on which such payment would be made in the ordinary course of the Debtor's business, consistent with past practice and in accordance with their terms and subject to the conditions of any agreements or regulations governing, instruments evidencing or other documents relating to such transactions; *provided, however*, that Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

### 2.    *Professional Compensation and Reimbursement Claims*

Except as provided in Article 2.1 of the Prepackaged Plan, all Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code (a "Professional Compensation and Reimbursement Claim") shall (a) file, on or before the date that is forty-five (45) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or allowing any such Administrative Expense Claim. The Reorganized Debtor is authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

RLF1 3582605v. 5

### 3. Priority Tax Claims

With respect to any Priority Tax Claims not paid pursuant to prior order of the Bankruptcy Court, except to the extent that a holder of an Allowed Priority Tax Claim against the Debtor agrees in writing to different treatment, each holder of an Allowed Priority Tax Claim shall, in full satisfaction, release and discharge of such Claim: (a) to the extent such Allowed Priority Tax Claim is due and owing on the Effective Date, be paid in full, in Cash, on the Effective Date; (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in Cash, in accordance with the terms of any agreement between the Debtor and such holder, or as may be due and owing under applicable non-bankruptcy law, or in the ordinary course of business; or (c) be treated on such other terms and conditions as are acceptable to the Debtor and the holder of such Claim.

### 4. Class 1 – Priority Non-Tax Claims

(i)     Impairment and Voting. Class 1 is unimpaired by the Prepackaged Plan. Each holder of an Allowed Priority Non-Tax Claim is not entitled to vote to accept or reject the Prepackaged Plan and shall be conclusively deemed to have accepted the Prepackaged Plan.

(ii)     Distributions. Except to the extent that a holder of an Allowed Priority Non-Tax Claim against the Debtor agrees in writing to different treatment, each such holder shall receive, in full satisfaction of such Allowed Priority Non-Tax Claim, Cash in an amount equal to the unpaid portion of such Claim, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date such Claim becomes Allowed and (iii) the date for payment provided by any agreement or understanding between the Debtor and the holder of such Claim.

### 5. Class 2 – Secured Lender Claim

(i)     Allowance, Impairment and Voting.   Class 2 is impaired by the Prepackaged Plan.  The Secured Lender Claim is hereby Allowed in full, and, for the avoidance of doubt, shall not be subject to avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), defense, counterclaim, cross-claim, disallowance, impairment, credit, objection or any challenges of any kind whatsoever under any applicable law or regulation by any Person, in the aggregate amount of $14.2 million, plus accrued and unpaid interest which, as of June 30, 2010, was $350,802.  The Secured Lender, as the holder of the Allowed Secured Lender Claim, is entitled to vote to accept or reject the Prepackaged Plan.

(ii)     On the Effective Date or as soon thereafter as is reasonably practicable, except to the extent that the Secured Lender agrees to less favorable treatment, the Secured Lender shall receive, in full and final satisfaction of the Allowed Secured Lender Claim, a Cash payment of $3,820,500 (the "Secured Lender Cash Payment") unless the Secured Lender Stock Election is made with respect to the Allowed Secured Lender Claim pursuant to Article 4.2(b)(ii) of the Prepackaged Plan.

In lieu of a distribution of the Secured Lender Cash Payment (in whole or in part) pursuant to Article 4.2(b)(i) of the Prepackaged Plan, the Secured Lender may elect (the "Secured Lender Stock Election") on the Secured Lender Ballot to receive all or any portion of

RLF1 3582605v. 5

the Secured Lender Cash Payment in shares of NFC Common Stock, with such shares of NFC Common Stock (the "Secured Lender Stock Consideration") valued for such purpose at the gross per share price generally paid for NFC Common Stock in connection with the NFC Stock Offering. The Secured Lender Stock Election shall be irrevocable.

For the avoidance of doubt, the distributions to the Secured Lender contemplated under Article 4.2(b) of the Prepackaged Plan shall be in full and final satisfaction of the Allowed Secured Lender Claim and the Secured Lender shall not be entitled to any additional distribution on account of any deficiency between the amount of the Allowed Secured Lender Claim and the value of any distributions made to the Secured Lender pursuant to Articles 4.2(b)(i) and 4.2(b)(ii) of the Prepackaged Plan.

6.    *Class 3 – Other Secured Claims*

(i)    <u>Impairment and Voting</u>. Class 3 is unimpaired by the Prepackaged Plan. Each holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Prepackaged Plan and shall be conclusively deemed to have accepted the Prepackaged Plan.

(ii)    <u>Distributions</u>. As of the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed Other Secured Claim agrees in writing to different treatment, the legal, equitable and contractual rights of each holder of such Claim shall remain unaltered by the Prepackaged Plan so as to leave such Claim unimpaired, and such Claim shall not be discharged by the Prepackaged Plan.

7.    *Class 4 – General Unsecured Claims*

(i)    <u>Impairment and Voting</u>. By agreement of the Secured Lender, Class 4 is unimpaired by the Prepackaged Plan. Each holder of an Allowed General Unsecured Claim is not entitled to vote to accept or reject the Prepackaged Plan and shall be conclusively deemed to have accepted the Prepackaged Plan.

(ii)    <u>Distributions</u>. As of the Effective Date, except to the extent that a holder of an Allowed General Unsecured Claim agrees in writing to different treatment, the legal, equitable and contractual rights of each holder of an Allowed General Unsecured Claim shall remain unaltered by the Prepackaged Plan so as to leave such Claim unimpaired, and such Claim shall not be discharged by the Prepackaged Plan.

8.    *Class 5 – TruPS Claims*

(i)    <u>Impairment and Voting</u>. Class 5 is impaired by the Prepackaged Plan. The TruPS Claims are hereby Allowed in full, and, for the avoidance of doubt, not subject to avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), defense, counterclaim, cross-claim, disallowance, impairment, credit, objection or any challenges of any kind whatsoever under any applicable law or regulation by any Person, in the aggregate amount of $22 million. The holders of TruPS Claims are entitled to vote to accept or reject the Prepackaged Plan.

(ii)     Distribution.  By agreement of the Secured Lender, on the Effective Date or as soon thereafter as is reasonably practicable, each holder of an Allowed TruPS Claim shall receive, in full and final satisfaction of such Claim, a Cash payment (the "TruPS Cash Payment") equal to $150.00 per $1,000 (15%) of the liquidation amount of the TruPS, as set forth in the Trust Documents, unless a TruPS Holder Stock Election is made by the holder of an Allowed TruPS Claim pursuant to Article 4.5(b)(ii) of the Prepackaged Plan; *provided, however*, that in the event that Class 5 (TruPS Claims) does not vote to accept the Prepackaged Plan, the TruPS Holder Stock Election shall not be available and all TruPS Claims shall be cancelled and discharged without any distribution.

Provided that Class 5 (TruPS Claims) has voted to accept the Prepackaged Plan, in lieu of a distribution of the TruPS Cash Payment (in whole or in part) pursuant to Article 4.5(b)(i) of the Prepackaged Plan, each holder of an Allowed TruPS Claim may elect (the "TruPS Holder Stock Election") on the TruPS Holder Ballot to receive all or any portion of the TruPS Cash Payment in shares of NFC Common Stock, with such shares of NFC Common Stock valued for such purpose at the gross per share price generally paid for NFC Common Stock in connection with the NFC Stock Offering.  The TruPS Holder Stock Election shall be irrevocable.

### 9.     *Class 6 – NFC Common Equity Interests*

(i)     Impairment and Voting.  Class 6 is impaired by the Prepackaged Plan. Holders of NFC Common Equity Interests are not entitled to vote to accept or reject the Prepackaged Plan and shall be conclusively deemed to have rejected the Prepackaged Plan.

(ii)     Distribution.  The holders of NFC Common Equity Interests shall not receive any distribution under the Prepackaged Plan on account of their Allowed NFC Common Equity Interest; provided, however, that, by agreement of the Secured Lender, all holders of Allowed NFC Common Equity Interests shall retain their shares of NFC Common Stock under the Prepackaged Plan diluted by shares issued pursuant to the Prepackaged Plan and the NFC Stock Offering and subject to any reverse stock split provided for in the Restated Certificate of Incorporation.

### 10.     *Class 7 - Section 510(b) Claims*

(i)     Impairment and Voting.  Class 7 is impaired by the Prepackaged Plan. Holders of Allowed Section 510(b) Claims are not entitled to vote to accept or reject the Prepackaged Plan and shall be conclusively deemed to have rejected the Prepackaged Plan.

(ii)     Distribution.  On the Effective Date, all Section 510(b) Claims shall be cancelled and discharged without any distribution.

## C.     Means for Implementation of the Prepackaged Plan

### 1.     *Recapitalization Transaction*

The NFC Stock Offering and the restructuring transactions contemplated in the Prepackaged Plan will deleverage the Debtor and provide necessary additional working capital to

Nexity Bank. Pursuant to the NFC Stock Offering, the Debtor will offer shares of NFC Common Stock in an aggregate gross principal amount of at least $175 million.

The NFC Stock Offering is expected to consist of a private placement under Section 4(2) of the Securities Act and Regulation D thereunder to institutional "accredited investors" (as that term is defined in Rule 501 under the Securities Act).

NFC expects that one or more institutional accredited investors will each enter into an agreement to acquire up to a number of NFC Common Shares representing 24.9% of the total outstanding NFC Common Stock upon completion of the NFC Stock Offering (each such investor, a "Lead Equity Investor"). NFC expects that each such Lead Equity Investor would enter into an agreement to acquire NFC Common Stock in the NFC Stock Offering within a short period after the commencement of the Chapter 11 Case. The closing of each such Lead Equity Investor's agreement to acquire NFC Common Stock would be conditioned on, among other things, confirmation of the Prepackaged Plan, the closing of the remainder of the NFC Stock Offering (as described below) and regulatory approvals.

NFC expects that the remaining NFC Common Stock will be offered and sold under Section 4(2) of the Securities Act and Regulation D thereunder, or Rule 144A and Regulation S thereunder, to institutional accredited investors, qualified institutional buyers and non-U.S. persons in offshore transactions, as applicable, that would each acquire up to a number of NFC Common Shares representing 9.9% of the total outstanding NFC Common Stock upon completion of the NFC Stock Offering (each such investor, an "Other Equity Investor"). NFC expects that the offering to the Other Equity Investors would commence within a short period prior to the Confirmation Date; that the Other Equity Investors would enter into agreements to acquire the NFC Common Stock shortly after the Confirmation Date (the "Trade Date"), conditioned upon, among other things, the closing of the private placement to the Lead Equity Investors; and that the NFC Stock Offering would close on the third business day after the Trade Date (the "NFC Stock Offering Closing Date").

NFC would receive the Offering Proceeds from the Lead Equity Investors and the Other Equity Investors on the NFC Stock Offering Closing Date, which would also be the Effective Date of the Prepackaged Plan.

NFC expects to grant registration rights to the Lead Equity Investors and the Other Equity Investors, pursuant to which such investors may cause NFC to register with the SEC under the Securities Act all or part of the shares of NFC Common Stock held by such investors. Holders of Claims who receive NFC Common Stock under this Prepackaged Plan will receive registration rights comparable to those provided to the Lead Equity Investors and the Other Equity Investors in the NFC Stock Offering.

Neither this Disclosure Statement nor the Prepackaged Plan constitutes an offer to sell or the solicitation of an offer to buy any securities in connection with the NFC Stock Offering. The securities that will be offered in the NFC Stock Offering will not be registered with the SEC and may not be offered or sold absent registration or an applicable exemption from the registration requirements of the Securities Act.

The Offering Proceeds raised through the NFC Stock Offering will then be used to (i) make the distributions contemplated under the Prepackaged Plan, (ii) pay the costs and expenses associated with the Chapter 11 Case and the transactions related to the recapitalization and (iii) contribute capital to Nexity Bank.

## 2. *Dissolution of the Trusts and Distribution of the Debentures*

Upon a Bankruptcy Event, including the commencement of the Chapter 11 Case, each Trust is required to be dissolved in accordance with the terms of its respective Trust Agreement. The Trustee shall in each case distribute, Pro Rata to the holders of TruPS issued by such Trust in accordance with the terms of the applicable Trust Documents, the Debentures held by such Trust in exchange for and in satisfaction of such TruPS holders' claims for distributions of their Pro Rata share of such principal and accrued interest payments on account of the TruPS.

## 3. *Retention of Certain NFC Common Equity Interests in Lieu of Certain Distributions to the Secured Lender*

As of the Effective Date, all holders of Allowed NFC Common Equity Interests shall be deemed to have retained their shares of NFC Common Stock under the Prepackaged Plan as agreed to by the Secured Lender.

## 4. *General Corporate Actions*

(i)     General.     Upon the occurrence of the Effective Date, all actions contemplated by the Prepackaged Plan shall be deemed authorized and approved in all respects, including (i) adoption of the new employment agreements with management for Reorganized NFC, (ii) the issuance and distribution of the NFC Common Stock to the Equity Investors or as otherwise provided under the Prepackaged Plan, (iii) selection of the directors and officers for Reorganized NFC, (iv) assumption of the FBRC Agreement and (v) all other actions contemplated by the Prepackaged Plan (whether to occur before, on or after the Effective Date). All matters and transactions provided for in the Prepackaged Plan concerning the corporate structure of the Debtor or the Reorganized Debtor, and any corporate action required by the Debtor or the Reorganized Debtor in connection with the Prepackaged Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors or officers of the Debtor or the Reorganized Debtor. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtor or the Reorganized Debtor, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Prepackaged Plan (or necessary or desirable to effect the transactions contemplated by the Prepackaged Plan) in the name of and on behalf of the Reorganized Debtor, including, without limitation, the Restated Bylaws, the Restated Certificate of Incorporation and the Subscription Agreements. Such authorizations and approvals shall be effective notwithstanding any requirements under non-bankruptcy law.

(ii)     Restated Organizational Documents of the Reorganized Debtor.     On the Effective Date, the Reorganized Debtor shall adopt the Restated Certificate of Incorporation and the Restated Bylaws and shall file the Restated Certificate of Incorporation with the Secretary of State of the State of Delaware. In addition, on or before the Effective Date, pursuant to and only

to the extent required by section 1123(a)(6) of the Bankruptcy Code, the Restated Certificate of Incorporation and the Restated Bylaws for the Reorganized Debtor shall also be amended as necessary to satisfy the provisions of the Bankruptcy Code and shall include, among other things, a provision prohibiting the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.

Additionally, the Restated Certificate of Incorporation would provide for a reverse stock split of the NFC Common Stock. One of the purposes of the reverse stock split would be to allow the issuance of additional NFC Common Stock to be effected at a price range that is generally perceived as more attractive to prospective investors than the current price range of the NFC Common Stock. Fractional shares created by the reverse stock split would be rounded up or down to the nearest whole share in accordance with Article VII.7.11 of the Prepackaged Plan, provided that such rounding does not have the effect of materially increasing any beneficial holder's ownership percentage. The exact exchange ratio of the reverse stock split will be determined by the Reorganized Debtor prior to the Confirmation Date and shall be subject to the approval of the Bankruptcy Court. As an example only, if the exchange ratio were determined to be a one share for 66 shares of the NFC Common Stock, then a holder of 10,000 shares of the NFC Common Stock prior to the reverse stock split would own 152 shares of common stock of the Reorganized Debtor after the reverse stock split, and because of the proportionate reduction in the total stock outstanding, that holder's percentage ownership, prior to the NFC Stock Offering, would not change. On the Effective Date, the board of directors of the Reorganized Debtor shall be deemed to have adopted the restated organizational documents for the Reorganized Debtor.

(iii)     Boards of Directors of the Reorganized Debtor. On the Effective Date, the operations of the Reorganized Debtor shall become the general responsibility of its board of directors, subject to and in accordance with the Restated Certificate of Incorporation and Restated Bylaws, which shall provide that the Reorganized Debtor shall continue to operate under the laws of Delaware and in accordance with the Subscription Agreements. The initial board of directors of the Reorganized Debtor shall consist of approximately nine (9) directors. The initial board of directors of the Reorganized Debtor shall be disclosed in the Prepackaged Plan Supplement.

(iv)     Officers of the Reorganized Debtor. On and after the Effective Date, Michael Gillfillan will become Chairman and Chief Executive Officer of the Reorganized Debtor and Nexity Bank and Andrew McGhee will become Executive Vice President and President of Commercial Banking of the Reorganized Debtor and Nexity Bank. Greg L. Lee, currently Chairman and CEO of the Debtor and Nexity Bank, will become Executive Vice President and President of Correspondent Banking of the Reorganized Debtor and Nexity Bank. David E. Long, currently President of the Debtor and Nexity Bank, will become Executive Vice President, Operations and Administration of the Reorganized Debtor and Nexity Bank and John J. Moran will remain as the Executive Vice President and Chief Financial Officer of the Reorganized Debtor. After the Effective Date, the selection of officers of the Reorganized Debtor shall be as provided by its organizational documents.

39

5. *Execution of Subscription Agreement*

Each Person receiving NFC Common Stock through either the NFC Stock Offering or as a result of distributions under the Prepackaged Plan shall execute a Subscription Agreement (or a document similar thereto) as a condition to receiving the NFC Common Stock.

6. *Cancellation of Existing Securities and Agreements*

(i)     Except (i) as otherwise expressly provided in the Prepackaged Plan, (ii) with respect to executory contracts or unexpired leases that have been assumed by the Debtor, (iii) for purposes of evidencing a right to distributions under the Prepackaged Plan or (iv) with respect to any Claim or Equity Interest that is reinstated and rendered unimpaired under the Prepackaged Plan, on the Effective Date, all of the agreements and other documents evidencing the Claims or rights of any holder of a Claim or Equity Interest against or Equity Interest in the Debtor shall be deemed automatically cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtor thereunder shall be discharged including, but not limited to, the obligations of the Debtor under the Debentures, the related Indentures, the Guarantee Agreements and any other Trust Documents.

(ii)     In connection with the Preferred Rights Agreement, on February 4, 2009, the Debtor declared a dividend distribution of one preferred stock purchase right (the "Preferred Stock Purchase Right") for each outstanding share of NFC Common Stock. Each Preferred Stock Purchase Right entitles the registered holder thereof to purchase from the Debtor a unit consisting of one one-thousandth of a share of a newly created series of NFC Preferred Stock, par value $0.01 per share, at a purchase price of $37.50 per unit, subject to adjustments for "triggering events" and the acquisition of certain minimum amounts of NFC Common Stock in "acquiring persons" as defined in the Preferred Rights Agreement. The Preferred Rights Agreement provides that the Rights may be redeemed at a redemption price of $0.001 per Right in cash or NFC Common Stock. Based upon 7,766,394 shares of NFC Common Stock outstanding, the Debtor will redeem the Rights for an aggregate cash payment of $7,767 and will terminate the Rights plan.

7. *Other Transactions*

On or as of the Effective Date or as soon as practicable thereafter and without the need for any further action, the Reorganized Debtor may engage in any transaction in furtherance of the Prepackaged Plan.

8. *Cancellation of Liens*

Except as otherwise specifically provided herein with respect to Class 3 Other Secured Claims as may be applicable, upon the occurrence of the Effective Date, any Lien securing any Secured Claim shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any Collateral or other property of the Debtor held by such holder and to take such actions as may be requested by the Reorganized Debtor, to evidence the release of such Lien, including the execution, delivery and filing or recording of such release as may be requested by the Reorganized Debtor.

### 9. *Agreements with Existing Management*

On the Effective Date, the Reorganized Debtor shall enter into new employment agreements with existing members of management who are currently subject to written employment agreements with the Debtor, and they shall become immediately effective. To the extent any such new employment agreements (or the terms thereof) are in existence at the time of the filing of the Prepackaged Plan Supplement, they will be included in such supplement. All prepetition agreements with existing members of management shall be deemed terminated as of the Effective Date without further act or action and any alleged claims arising from the termination of such agreements and the Debtor's obligations thereunder shall be disallowed and expunged.

## D. Provisions Governing Distributions

### 1. *Date of Distributions on Account of Allowed Claims*

Except as otherwise specifically provided herein, any distributions and deliveries to be made under the Prepackaged Plan shall be made on the Effective Date or as soon as practicable thereafter. In the event that any payment or act under the Prepackaged Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 2. *Sources of Cash for the Prepackaged Plan Distribution*

Except as otherwise specifically provided herein or in the Confirmation Order, all Cash required for the payments to be made hereunder shall be obtained from the Debtor's and the Reorganized Debtor's operations, Cash on hand and the Offering Proceeds.

### 3. *Time Bar to Cash Payments*

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within one hundred eighty (180) days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Reorganized Debtor by the holder of the Allowed Claim to whom such check was originally issued. Any Claim in respect of such a voided check shall be made on or before the first anniversary of the date on which such distribution or payment was made. If no Claim is made as provided in the preceding sentence, all Claims in respect of voided checks shall be discharged and forever barred and such unclaimed distributions shall revert to the Reorganized Debtor, notwithstanding any federal or state escheat laws to the contrary.

### 4. *Disbursing Agent*

All distributions under the Prepackaged Plan shall be made by the Disbursing Agent. The Disbursing Agent shall be deemed to hold all property to be distributed hereunder in trust for Persons entitled to receive the same. The Disbursing Agent shall not hold an economic or beneficial interest in such property. The Disbursing Agent shall not be required to give any bond

41

or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

### 5. Rights and Powers of Disbursing Agent

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Prepackaged Plan, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Prepackaged Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Prepackaged Plan.

### 6. Expenses of the Disbursing Agent

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent (including taxes and reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtor in the ordinary course of business.

### 7. Record Date for Distribution

The record date for distributions shall be the Distribution Record Date. Distributions shall only be made to the record holders of Allowed Claims as of the Distribution Record Date. On the Distribution Record Date, at the close of business for the relevant register, all registers maintained by NFC and Reorganized NFC, and each of their respective agents, successors and assigns, shall be deemed closed for purposes of determining whether a holder of such a Claim is a record holder entitled to distributions under the Prepackaged Plan. NFC and Reorganized NFC, and all of their respective agents, successors and assigns shall have no obligation to recognize, for purposes of distributions pursuant to or in any way arising from the Prepackaged Plan (or for any other purpose), any Claims that are transferred after the Distribution Record Date. Instead, they shall be entitled to recognize only those record holders set forth in the registers as of the Distribution Record Date, irrespective of the number of distributions made under the Prepackaged Plan or the date of such distributions. Furthermore, if a Claim (other than the Secured Lender Claim) is transferred twenty (20) or fewer calendar days before the Confirmation Date, the Disbursement Agent shall make distributions to the transferee only if the transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

If any dispute arises as to the identity of a holder of an Allowed Claim that is entitled to receive a distribution pursuant to the Prepackaged Plan, the Disbursing Agent or the servicers, as applicable, may, in lieu of making such distribution to such Person, make the distribution into an escrow account until the disposition thereof is determined by a Final Order or by written agreement among the interested parties to such dispute.

### 8. Delivery of Distributions

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth in the books and records of the Debtor, unless the Debtor has been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim or interest by such holder that contains an address for such holder different from the address reflected on such schedules for such holder. In the event that any distribution to any holder is returned as undeliverable, the Disbursing Agent shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made to such holder without interest; *provided, however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtor, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred, notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary.

### 9. Manner of Payment Under Prepackaged Plan

(i)     All distributions of NFC Common Stock under the Prepackaged Plan shall be made by the Disbursing Agent on behalf of the Debtor.

(ii)     All distributions of Cash under the Prepackaged Plan shall be made by the Disbursing Agent on behalf of the Debtor.

(iii)     At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

### 10. Fractional Dollars

Notwithstanding any other provision of the Prepackaged Plan, neither the Disbursing Agent nor the Reorganized Debtor shall be required to make distributions or payments of fractions of dollars, and whenever any payment of a fraction of a dollar under the Prepackaged Plan would otherwise be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

### 11. Fractional Shares

Notwithstanding any other provision of the Prepackaged Plan, no fractional shares of NFC Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional shares. When any distribution pursuant to the Prepackaged Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of NFC Common Stock that is not a whole number, the actual distribution of shares of NFC Common Stock shall be rounded as follows: (a) fractions of one-half (1/2) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (1/2) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of

NFC Common Stock to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

### 12. Setoffs and Recoupment

Except as otherwise specifically provided for herein, the Debtor may, but shall not be required to, setoff against or recoup from any Claim any claims of any nature whatsoever that the Debtor may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any such claim they may have against such claimant.

### 13. Distributions After Effective Date

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 14. Allocation of Payments under the Prepackaged Plan

In the case of distributions with respect to holders of Claims pursuant to the Prepackaged Plan, the amount of any Cash and the fair market value of any other consideration received by the holder of such Claim shall be allocable first to the principal amount of such Claim (as determined for federal income tax purposes) and then, to the extent of any excess, the remainder of the Claim.

### 15. No Postpetition Interest on Claims

Except as otherwise specifically provided for herein, in the Confirmation Order or in any other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

## ARTICLE IV
## PROCEDURES FOR TREATING
## DISPUTED CLAIMS UNDER THE PREPACKAGED PLAN

### A. Objections to Claims

Except insofar as a Claim is Allowed under the Prepackaged Plan, the Debtor, the Reorganized Debtor or any other party in interest shall be entitled to object to Claims. Any objections to Claims shall be served and filed (i) on or before the ninetieth (90th) day following the later of (x) the Effective Date and (y) the date that a proof of Claim is filed or amended or the Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim or (ii) such later date as ordered by the Bankruptcy Court.

RLF1 3582605v. 5

*1.* *No Distributions Pending Allowance*

If the Debtor objects to any Claim, no payment or distribution provided under the Prepackaged Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

*2.* *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Prepackaged Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Prepackaged Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

*3.* *Resolution of Disputed Claims*

Notwithstanding any prior order of the Bankruptcy Court, on and after the Effective Date, the Reorganized Debtor shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Disputed Claims and to compromise, settle or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court, other than with respect to Professional Compensation and Reimbursement Claims.

**B.  Treatment of Executory Contracts and Unexpired Leases**

*1.  Assumption of Contracts and Leases.*

Except as otherwise specifically provided herein, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Prepackaged Plan, as of the Effective Date, the Debtor shall be deemed to have assumed each executory contract and unexpired lease to which it is a party pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such contract or lease (i) was previously assumed or rejected by the Debtor, (ii) was previously expired or terminated pursuant to its own terms, (iii) is the subject of a motion to reject filed by the Debtor on or before the Confirmation Date or (iv) is set forth in a schedule, as an executory contract or unexpired lease to be rejected, filed as part of the Prepackaged Plan Supplement. The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions or rejections described above, as of the Effective Date.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements or

franchises and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

Each executory contract assumed pursuant to the Prepackaged Plan (or pursuant to other Bankruptcy Court order) shall remain in full force and effect and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Prepackaged Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

Unless otherwise specified, each executory contract and unexpired lease shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on such schedule.

For the avoidance of doubt, the Debtor shall assume the FBRC Agreement, and the Reorganized Debtor shall pay and satisfy all obligations due to FBRC, any of its Affiliates and its professionals under the FBRC Agreement in the ordinary course of business. Accordingly, no administrative expense claim or other type of claim need be filed in connection with the FBRC Agreement. The Debtor's rights, in whatever form, shall be governed by the terms of the FBRC Agreement, and the Debtor shall not take any action against any FBRC or its Affiliates in the Bankruptcy Court that is inconsistent with the terms of such documentation.

## C.     Payments Related to Assumption of Contracts and Leases

Any monetary amounts by which any executory contract and unexpired lease to be assumed hereunder are in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption thereof. If there is a dispute regarding (i) the nature or amount of any Cure; (ii) the ability of the Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (iii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be.

**The Debtor hereby gives notice that the Cure amounts for each such contract and lease shall be zero dollars unless otherwise noticed in the Prepackaged Plan Supplement.**

## D.     Claims Based on Rejection of Executory Contracts or Unexpired Leases

All Claims arising out of the rejection of executory contracts and unexpired leases must be served upon the Debtor and its counsel within thirty (30) days after the earlier of (i) the date of entry of an order of the Bankruptcy Court approving such rejection or (ii) the Confirmation Date. Any Claims not filed within such time shall be forever barred from assertion against the Debtor, its Estate and its property.

RLF1 3582605v. 5

### E. Insurance Policies

Notwithstanding anything contained in the Prepackaged Plan to the contrary, unless specifically rejected by order of the Bankruptcy Court, all of the Debtor's insurance policies and any agreements, documents or instruments relating thereto, shall be continued. Nothing contained in Article 9.4 of the Prepackaged Plan shall constitute or be deemed a waiver of any cause of action that the Debtor may hold against any entity, including, without limitation, the insurer, under any of the Debtor's insurance policies.

### F. Conditions Precedent to Effective Date

#### 1. Conditions Precedent to Effective Date of Prepackaged Plan

The occurrence of the Effective Date of the Prepackaged Plan is subject to satisfaction of the following conditions precedent:

(i) <u>Confirmation Order</u>. The Clerk of the Bankruptcy Court shall have entered the Confirmation Order in the Chapter 11 Case and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto.

(ii) <u>Execution and Delivery of Other Documents</u>. All other actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Prepackaged Plan shall be in effect and shall have been duly and validly executed and delivered by the parties thereto and, in each case, (i) shall have been approved, (ii) all conditions to their effectiveness shall have been satisfied or waived in accordance with their respective terms and (iii) shall be consistent in all material respects with the Prepackaged Plan.

(iii) <u>Regulatory Approvals</u>. The Debtor shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents that are necessary to implement and effectuate the Prepackaged Plan and that are required by law, regulations or order.

(iv) <u>Consents</u>. All authorizations, consents and approvals determined by the Debtor to be necessary to implement and effectuate the terms of the Prepackaged Plan shall have been obtained and not be revoked.

(v) <u>Corporate Formalities</u>. The Restated Certificate of Incorporation of Reorganized NFC shall be filed with the Secretary of State for Delaware contemporaneously with the Effective Date.

(vi) <u>NFC Stock Offering</u>. The Debtor shall have raised a minimum of $175 million in gross proceeds in connection with the sale of NFC Common Stock pursuant to the NFC Stock Offering.

(vii) <u>Recapitalization of Nexity Bank</u>. That portion of the Offering Proceeds not otherwise allocated (a) for the distributions contemplated under the Prepackaged Plan; (b) as working capital to fund the go-forward operations of NFC; and/or (c) to pay the costs and

47

expenses associated with the Chapter 11 Case and the transactions related to the recapitalization, shall have been, or simultaneously will be, distributed to Nexity Bank.

(viii) <u>Other Acts</u>. Any other actions the Debtor reasonably determines are necessary to implement and effectuate the terms of the Prepackaged Plan shall have been taken.

### 2. *Waiver of Conditions Precedent*

Each of the conditions precedent in Article 10.1(a) through (h) of the Prepackaged Plan may be waived, in whole or in part, by the Debtor without notice or order of the Bankruptcy Court.

### 3. *Revocation of Prepackaged Plan*

The Debtor, in its sole discretion, reserves the right to revoke and withdraw the Prepackaged Plan prior to the Confirmation Date. If the Debtor revokes or withdraws the Prepackaged Plan, then the Prepackaged Plan shall be null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against or Equity Interests in the Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any other Person in any proceedings involving the Debtor, or be deemed an admission by the Debtor.

### 4. *Reservation of Rights*

The Prepackaged Plan shall have no force or effect unless and until the Effective Date occurs. Prior to the Effective Date, none of the filing of the Prepackaged Plan, any statement or provision contained in the Prepackaged Plan, or action taken by the Debtor with respect to the Prepackaged Plan shall be, or shall be deemed to be, an admission or waiver of any rights of the Debtor or any other party with respect to any Claims or Equity Interests or any other matter.

### 5. *Substantial Consummation*

Substantial consummation of the Prepackaged Plan under section 1101(2) of the Bankruptcy Code shall be deemed to occur on the Effective Date.

## G. Effect of Confirmation

### 1. *Vesting of Assets*

Except as otherwise provided in the Prepackaged Plan, the Debtor, as the Reorganized Debtor, shall continue to exist on and after the Effective Date as a separate Person with all of the powers available to such legal entity under applicable law, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law. The property of the Estate, together with any property of the Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the Prepackaged Plan, shall vest in the Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtor may operate its businesses and may use, acquire and dispose of property without application to or approval by the Bankruptcy Court, and free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules

48